UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| ROBERT P. MAHER and MARILYN V. MAHER, individuals, | ) ) ) | No. 12 C 7169 |
| Plaintiffs, | ) ) ) | Judge Marvin E. Aspen |
| v. | ) ) | |
| THE ROWEN GROUP. INC., d/b/a PLAYROOM ENTERTAINMENT, a California corporation, and DANIEL M.J. ROWEN, an individual, | ) ) ) ) ) | Magistrate Judge Arlander Keys |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiffs Robert and Marilyn Maher, husband and wife, made a loan to the Rowen Group, a California corporation that is run by Dan Rowen and does business as Playroom Entertainment. Playroom makes and sells niche toys and games, both on its own and through distributors, including a company called ACD, which is run by the Mahers' son, Robert, Jr. The Mahers (Robert, Sr. and Marilyn) and Mr. Rowen executed a loan agreement on June 30, 2011; under the terms of the agreement, the Mahers agreed to advance up to $500,000 to the Rowen Group and Mr. Rowen, to be repaid quarterly with payments totaling just shy of $30,000. The loan was secured by the defendants' assets, as spelled out in a separate "Security Agreement" signed that same day. Mr. Rowen also signed a promissory note and an unconditional guaranty agreement.

In addition to the provisions concerning repayment of the advances, the loan agreement contained provisions concerning how the advances made under the agreement could be used (§2.1) and required the Rowen Group and Mr. Rowen to, *inter alia*, "use their best efforts to keep true and complete financial records" and to keep records, by October 31, 2011, in accordance with GAAP"; refrain from incurring additional debt without the prior written consent of the Mahers; and pay their other debts and meet their other obligations so as not to adversely affect the company's financial condition. *See* Loan Agreement, §5.2(a), §6.2, §8.4. The loan agreement also provided that, in the event of a default, the full indebtedness would become immediately due and payable – either automatically or at the Mahers' discretion, depending on the default event. Id., §§9.1, 9.2.

It is undisputed that the Mahers advanced something less than the full $500,000 to the defendants – roughly $435,000; and it is also undisputed that the defendants have consistently made the required payments as provided in the loan documents. Nevertheless, on August, 20, 2012, the Mahers' attorney sent a notice of default letter to the Rowen Group, claiming that it was in default under all of the provisions identified above, plus several additional provisions; they invoked the acceleration provision of the agreement and declared all indebtedness immediately due and payable. The Mahers, through their attorney,

sent a separate letter to Mr. Rowen demanding that he make payment in full, consistent with the unconditional guaranty agreement. According to evidence taken at a hearing on September 20, 2012, Mr. Rowen attempted to come up with the money to pay off the balance on the loan - and, indeed, the evidence shows that he was successful in this regard, but that the deal fell apart over some concessions Playroom was seeking from ACD, the company owned by the Mahers' son, which enjoyed deep discounts and an exclusive distribution deal with Playroom (a condition of the loan from the Mahers).

After declining to give Mr. Rowen an additional two days to nail down the specifics of the payoff, the Mahers filed this lawsuit on September 7, 2012, alleging that the defendants had defaulted on the loan. At the same time, they filed an emergency motion seeking the appointment of a receiver to monitor and run Playroom, ostensibly to prevent any further dissipation of the company's assets, which served as the collateral for the loan. Judge Aspen referred the motion to this Court, and the Court held an evidentiary hearing on the motion to determine whether the defendants' assets were truly at risk and to otherwise determine whether the appointment of a receiver - a drastic step to be sure - was, in fact, appropriate.

At the hearing, which occurred September 20, 2012, the Court heard testimony from Robert Maher and Tony Natale, the

plaintiffs' proposed receiver, as well as from Mr. Rowen. After considering this testimony, as well as the documentary exhibits submitted and the arguments of the parties, the Court is persuaded that no receiver is necessary. Thus, for the reasons explained more fully below, the plaintiffs' motion is denied.

## Discussion

"Federal courts have an inherent equitable power to appoint a receiver to manage a defendant's assets during the pendency of litigation." *Matter of McGaughey*, 24 F.3d 904, 907 (7th Cir. 1994)(citations omitted). "[T]he primary consideration in determining whether to appoint a receiver is the need to protect, conserve and administer property pending final disposition of a suit"; thus the remedy is especially appropriate "in cases involving fraud and the possible dissipation of assets." *Jackson v. N'Genuity Enterprises Co.*, No. 09 C 6010, 2011 WL 4628683, at *8 (N.D. Ill. Oct. 3, 2011)(citing *McGaughey*, 24 F.3d at 907). In their motion, the Mahers argue that both fraud and the potential for asset dissipation exist here. But, after hearing the testimony of Mr. Maher and Mr. Rowen, the Court disagrees.

First, the Mahers have not shown that there was ever any fraud involved here. Mr. Maher testified that his son, Robert, Jr., who had a longstanding business relationship with Mr. Rowen and knew he was attempting to obtain financing for his company, suggested they meet. Transcript of September 20, 2012 hearing,

4

p. 5. Mr. Maher testified that he visited Mr. Rowen's offices in Sherman Oaks in April of 2011 "to look over his records and products and get an idea as to where the business was going to enable me to decide whether I wanted to make a loan or not." *Id.*, p. 6. At that time, Mr. Rowen shared sales summaries and sales projections, and they discussed that his company was having some difficulties caused by Mr. Rowen's former partner, who had left the company, and then the country, because of personal problems. Mr. Maher, an experienced and seasoned businessman, recognized that the company's books and records were in a shambles and recognized that the company was having trouble with some past debts; despite this, he decided to make the loan. *Id.*, p. 12.

Although the Mahers have alleged that the defendants were somehow misleading in what they produced in the due diligence phase of the loan transaction, the evidence does not bear this out. On the contrary, based upon the evidence adduced thus far, it appears that Mr. Rowen produced and disclosed all relevant information available at the time. And, although Mr. Maher has offered reports and other documents run from the MAS 500 accounting system to show that Playroom's financial situation is precarious, the testimony is clear that Playroom had an abundance of problems and issues with the way information was entered into that system, casting some measure of doubt on its reliability.

The testimony casts doubt on some of the Mahers' other claims as well. For example, they claim that the Rowen Group was in default for failing to advise them of a lawsuit filed by Triways, a trucking company that did business with Playroom; yet the evidence makes clear that the debt to Triways was disclosed, that the debt is disputed, and that Playroom is meeting its obligations with respect to that debt. Although the question of whether the defendants defaulted under the loan agreement is not presently before the Court, these issues do tend to undermine the plaintiffs' stated need for emergency relief.

Nor is there any real question of dissipation. Mr. Rowen testified that Playroom's licenses remain intact and are not in any way at risk, and the Mahers have offered nothing to challenge that assertion. He also testified that, although Playroom's sales have fallen short of his projections, he expected that fourth quarter sales would be higher, given that the months leading into the holiday season are historically the busiest for the toy and game industry. Again, the Mahers offered the Court no reason to doubt this proposition. The Mahers have made much of a recent liquidation of inventory by Playroom. But Mr. Rowen testified that this sale was done with the knowledge and consent of Robert, Jr., who handled the distribution of that inventory, and who agreed that it was the right move for Playroom. And Mr. Rowen's testimony makes clear that he intends to replace the

inventory if permitted to do so, and that he has no intent to further liquidate his inventory. Again, the Court has no reason to doubt this and no reason to doubt that the transaction was done in the best interests of the company, which actually serves to preserve the value of the Mahers' collateral.

Based upon the record before it, the Court is not convinced that the defendants' assets are at risk. On the contrary, after hearing from Mr. Rowen, whom the Court finds credible, the Court is persuaded that any diminution in inventory is temporary and that most (or at least some) of the issues facing Playroom are a direct result of the conditions and limitations imposed on it by the Mahers (whether they are matters of accounting, resulting from the fact that the Mahers required Playroom to switch over to its accounting system and kept them reliant on Marilyn Maher for updates and data entry;[1] or whether they are matters of inventory control, resulting from the requirements - again, imposed by the Mahers - that Playroom grant exclusivity and deep discounts to ACD, the company owned by the Mahers' son.

Based on the evidence produced thus far, the Court is left with the impression that the Mahers put the defendants in a box, and are now merely complaining that they are failing to thrive

---

[1] Despite what the loan agreement says, it is clear that Mr. Maher didn't just want Playroom to keep records in accordance with Generally Accepted Accounting Principles; he wanted them to adopt and implement MAS 500, the accounting system Marilyn Maher used at their son's distribution company.

inside that box. Clearly, the defendants are not running Playroom Enterprises' business in the manner Mr. Maher wants them to - and clearly, he has the right under the loan documents to impose upon them any operating and business restrictions they agree to bear (within the confines of the law). But, as noted, the question of whether the defendants defaulted on one or more of the conditions imposed in the agreement is not now before this Court. The only question before the Court is whether a receiver should be appointed. And the fact that Mr. Rowen may not be handling his books or inventory in the manner Mr. Maher deems best is not enough to warrant wresting control from him and handing it over to a receiver. Indeed, under the circumstances, appointing a receiver helps no one; it won't help the defendants stay in business, and it won't help the Mahers remain whole under the contract.

Moreover, given the evidence of Playroom's solvency and Mr. Rowen's personal assets, the Court has no reason to think that he cannot make good on his personal guarantee if and when a default is deemed to have occurred; certainly at this point the Mahers have not demonstrated that they will be in any way harmed, let alone irreparably harmed, in the absence of a receiver. Ironically, their interests are much more likely to dissipate with a receiver at the helm than they would if Mr. Rowen is left in charge.

## Conclusion

For the reasons explained more fully above, the Court denies the plaintiffs' emergency motion seeking the appointment of a receiver [#7] and vacates the standstill order. The status hearing set for October 5, 2012 at 9:00 a.m. is stricken, the referral of this matter is closed and the case is returned to the district judge.

Dated: September 28, 2012

ENTER:

_____
ARLANDER KEYS
United States Magistrate Judge