# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| ROBERT P. MAHER and MARILYN V. MAHER, individuals, | ) ) ) |
| Plaintiffs, | ) Case No. 12-cv-07169 ) |
| v. | ) Honorable Marvin E. Aspen ) |
| THE ROWEN GROUP, INC., d/b/a PLAYROOM ENTERTAINMENT, a California corporation; and DANIEL M. J. ROWEN, an individual, | ) Magistrate Judge Arlander Keys ) ) ) ) |
| Defendants. | ) |

## MEMORANDUM OPINION AND ORDER

Plaintiffs Robert P. Maher ("Maher Sr.") and Marilyn V. Maher (collectively "the Mahers") filed suit against Defendants The Rowen Group, Inc., Playroom Entertainment ("Playroom"), and Daniel M. J. Rowen ("Rowen") alleging breach of contract and fraud. (Dkt. No. 1.) Rowen filed a four-count counterclaim alleging fraud (Count I), conspiracy in restraint of trade (Count II), breach of contract (Count III), and tortious interference with a contract (Count IV). (Dkt. No. 29.) Rowen later amended the counterclaim, adding Robert P. Maher Jr. ("Maher Jr.") and ACD Distribution LLC ("ACD") as defendants to Counts I and II. (Dkt. No. 33.) Presently before us is the Mahers' motion to dismiss Rowen's amended counterclaim. (Dkt. No. 34.) For the reasons set forth below, we grant the Mahers' motion with respect to Counts I and II of the amended counterclaim, and deny the motion as to Counts III and IV.

**BACKGROUND**

The following facts are drawn from Rowen's amended counterclaim and accepted as true for the purposes of this motion. Rowen is President of The Rowen Group Inc., a California corporation that conducts business under the name Playroom Entertainment. (Am. Countercl. ¶ 9.) Playroom manufactures toys, primarily in the hobby and game industries. (*Id.*) Rowen approached Maher Jr. to solicit a loan for Playroom, in exchange for which Rowen offered a large discount on Playroom's goods to ACD, a distributor in the hobby and game industries. (*Id.* ¶ 14, 16.) Maher Jr. is President of ACD and his mother, Marilyn Maher, is Chief Financial Officer. (*Id.* ¶ 11) Maher Jr. told Rowen that his parents, Maher Sr. and Marilyn, might be willing to provide a larger loan to Playroom if Playroom signed an exclusive distribution agreement with ACD. (*Id.* ¶¶ 15–16.) Rowen then began negotiating over the terms of the Loan with Maher Sr. (*Id.* ¶¶ 16–18.)

On June 30, 2011, Rowen and the Mahers executed a Loan Agreement ("Loan"), whereby the Mahers agreed to loan Playroom $500,000. (*Id.* ¶ 26) The parties also executed a Security Agreement, a Promissory Note ("Note"), and an Unconditional Guaranty Agreement ("Guaranty") (collectively "Loan Documents"). (Compl. ¶ 12–15.) The Loan was conditioned on Playroom's execution of an exclusive distribution agreement ("Distribution Agreement") with ACD. (Am. Countercl. ¶ 16.) Rowen and ACD executed the Distribution Agreement on July 14, 2011. (*Id.* ¶ 27.)

As part of the loan agreement, Playroom was required to switch to ACD's accounting software, maintain its financial records in accordance with Generally Accepted Accounting Principles ("GAAP"), and sever its relationship with a third-party factoring company it used for

2

processing invoices. (*Id*. ¶¶ 23–24.) Before executing the Loan and Distribution Agreement, the Mahers made a number of oral promises to Rowen. Specifically, the Mahers stated that Marilyn Maher and ACD would provide training to Playroom employees regarding how to use ACD's accounting software, and Maher Sr. would personally factor Playroom's invoices.[1] (*Id*.) Maher Sr. and Maher Jr. also promised that ACD would prioritize sales and promotion of Playroom's goods and that ACD would make up for any sales Playroom lost as a result of the Distribution Agreement. (*Id*. ¶ 20.) After executing the Loan, the Mahers made further oral promises that Marilyn Maher would perform accounting services for Playroom and maintain its financial records in accordance with GAAP, that the Mahers would loan Playroom an additional $200,000 if needed, and that Playroom's settlement with a Chinese manufacturer was accurately represented in accordance with GAAP in its financial records. (*Id*. ¶¶ 23–24, 26, 32.)

Rowen alleges that the Mahers failed to make good on these promises. Marilyn Maher did not shift Playroom's accounting records onto the new software in a timely fashion nor did she maintain Playroom's financial records in accordance with GAAP. (*Id*. ¶¶ 29–31.) ACD did not prioritize sales and promotion of Playroom's products. As a result, Playroom had substantially lower sales than usual in the third and fourth quarters of 2011, and its financial records are not up to date and in accordance with GAAP. (*Id*. ¶ 28.) Pursuant to the Loan, the Mahers initially advanced $435,000 of the agreed upon $500,000 to Playroom. However, the

---

[1] Factoring is a form of commercial financing whereby a business (assignor) sells its accounts receivable (invoices) to a third party (factor). The factor is obligated to pay for the receivables at maturity and this is represented as an asset on the assignor's balance sheet. The factor will often provide an advance payment, in the form of cash, to the assignor before the maturity date. This method of factoring is a common means of increasing cash flow to finance the day-to-day activities of a business. *See* Albert F. Reisman, *What the Commercial Lawyer Should Know About Commercial Finance and Factoring*, 79 Com. L.J. 146, 147 (1974).

Mahers refused to supply Playroom with the final $65,000 due under the Loan because they alleged Playroom was in "possible default." (*Id*. ¶¶ 33–35.) Subsequently, the Mahers filed suit against Rowen for breach of contract and fraud. (*Id*. ¶ 40.)

## STANDARD OF REVIEW

We apply the same legal standard of review for motions to dismiss counterclaims as we do for motions to dismiss complaints. *See McLaughlin v. Chi. Transit Auth.*, 243 F. Supp. 2d 778, 779 (N.D. Ill. 2003). A motion to dismiss under Rule 12(b)(6) is meant to test the sufficiency of the complaint, not to decide the merits of the case. *Gibson v. City of Chi.*, 910 F.2d 1510, 1520 (7th Cir. 1990). A court may grant a motion to dismiss under Rule 12(b)(6) only if a complaint lacks enough facts "to state a claim for relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 1949 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S. Ct. 1955, 1974 (2007)); *Killingsworth v. HSBC Bank Nev., N.A.*, 507 F.3d 614, 618–19 (7th Cir. 2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678, 129 S. Ct. at 1949.

Although a facially plausible complaint need not give "detailed factual allegations," it must allege facts sufficient "to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555, 127 S. Ct. at 1964–65. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678, 129 S. Ct. at 1949. These requirements ensure that the defendant receives "fair notice of what the . . . claim is and the grounds upon which it rests." *Twombly*, 550 U.S. at 555, 127 S. Ct. at 1964–65. At this stage in the litigation we take as true all factual allegations made in the complaint, and construe

all reasonable inferences in the plaintiff's favor. *Murphy v. Walker*, 51 F.3d 714, 717 (7th Cir. 1995). Additionally, we consider documents attached and "incorporated into the complaint by reference" when considering a 12(b)(6) motion to dismiss. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007). *See also Thompson v. Ill. Dept. of Prof'l Regulation*, 300 F.3d 750, 753 (7th Cir. 2002) (citing Fed. R. Civ. P. 10© ("A copy of any written instrument which is an exhibit to a pleading is a part thereof for all purposes.")).

## ANALYSIS

**I.  Fraud (Count I)**

In support of his promissory fraud claim, Rowen alleges the Mahers and Maher Jr. made a series of false promises to induce him to execute the Loan and Distribution Agreement. He also states the Mahers promised to take certain actions after entering into these agreements and then reneged on all of these promises. The Mahers argue that Rowen's promissory fraud claim is barred by the Illinois Credit Agreements Act, 815 ILCS 160/1 ("ICAA"), because it relies on promises made by the Mahers and Maher Jr. to take certain actions related to the parties' credit agreement.

**A. The Applicability of the ICAA to Rowen's Fraud Claim**

The ICAA precludes all claims by debtors "in any way related to a credit agreement," unless those claims are premised upon a written agreement signed by both parties. 815 ILCS 160/2. In addition to prohibiting actions based on new oral credit agreements, the ICAA also bars actions that rely on an oral agreement to modify an existing credit agreement. 815 ILCS 160/3. The applicability of the ICAA in this case depends on whether the oral promises underlying the fraud claim form part of, or otherwise modify, the parties' written credit

5

agreement. Therefore, we must first define the scope of the written credit agreement, and then determine how the oral promises at issue here relate to the written agreement.

### 1. The Scope of the Credit Agreement

The ICAA defines a "credit agreement" as "an agreement or commitment by a creditor to lend money or extend credit or delay or forbear repayment of money not primarily for personal, family or household purposes, and not in connection with the issuance of credit cards." 815 ILCS 160/1(1). "If any portion of the parties' agreement takes the form of a loan or an extension of credit, the ICAA applies." *Help at Home, Inc. v. Med. Capital, L.L.C.,* 260 F.3d 748, 754 (7th Cir. 2001) (citing *Whirlpool Fin. Corp. v. Sevaux*, 96 F.3d 216, 223 (7th Cir. 1996)). The parties agree that the Loan and the related Loan Documents form a credit agreement under the plain language of the ICAA. They dispute, however, whether the Distribution Agreement is also part of the credit agreement.

The Mahers contend that the Distribution Agreement was an integral part of the Loan and as such should be considered "part and parcel" of the comprehensive credit agreement. (Mem. at 4.) We have not found any Illinois cases addressing the ICAA's applicability to an exclusive distribution agreement like the one at issue here. The majority of ICAA cases involving integral related documents have dealt with guaranty agreements, which unlike the Distribution Agreement, could not stand independently of the underlying loan. *See, e.g., General Electric Business Fin. Servs., Inc. v. Silverman*, 693 F. Supp. 2d 796, 803 (N.D. Ill. 2010); *Bank One, Springfield v. Roscetti*, 309 Ill. App. 3d 1048, 1058, 723 N.E.2d 755, 762 (4th Dist. 1999). Other cases involve collateral insurance and escrow agreements, which are financial instruments that also would typically not exist without an underlying credit agreement. *See R & B Kapital Dev't*

*LLC v. North Shore Cmty. Bank & Trust Co.,* 358 Ill. App. 3d 912, 919, 832 N.E.2d 246, 253 (1st Dist. 2005); *Nordstrom v. Waukanda Nat'l Bank,* 282 Ill. App. 3d 142, 144, 668 N.E.2d 586, 587 (2d Dist. 1996).

An exclusive distribution agreement is not a financial instrument that is commonly a condition precedent to a loan. In this case, however, the purpose of the Distribution Agreement is analogous to the purpose of other types of documents that have been considered part of a credit agreement under the ICAA. Without the Distribution Agreement, the Mahers would not have extended the Loan to Rowen and Playroom, and without the Loan, Rowen would not have signed the Distribution Agreement with ACD. Because the two agreements were mutually dependent, the Distribution Agreement was integral to the credit agreement. *See Help at Home*, 260 F.3d at 756 ("[The lender] only agreed to extend the loan to the borrower if the borrower could secure a guarantor. As a result, the guaranty agreement was an integral part of the loan . . . ."); *In re American Consol. Transp. Cos., Inc.*, 433 B.R. 242, 249 (Bankr. N.D. Ill. 2010) (holding that an interest rate swap agreement was not integral to the loan because there was no evidence "that the bank would not have extended the loan had American not entered into the swap agreement.").

This conclusion is further supported by the text of the Loan, which states that all funds after the initial $75,000 disbursement "shall be contingent on and conditioned upon . . . Lender's determination that Borrower has granted to ACD . . . certain exclusive distribution rights . . ." (Compl., Ex. A) The parties freely admit they would not have executed their deal without both agreements in place. (Am. Countercl. ¶ 16, Mem. at 4.) Under these circumstances, the two agreements effectively form a single transaction. Accordingly, we hold that the Distribution

Agreement is part of the credit agreement for the purposes of the ICAA.

## 2. The Oral Agreements

Having determined that the Distribution Agreement is part of the parties' credit agreement, we hold that the alleged oral promises related to the Distribution Agreement also fall within the scope of the ICAA. The ICAA "is to be construed broadly to prohibit all claims arising from alleged extra-contractual representations, omissions or conduct in a credit relationship." *VR Holdings, Inc. v. LaSalle Bus. Credit, Inc.*, No. 01 C 3012, 2002 WL 356515, at *3 (N.D. Ill. Mar. 6, 2002).

In this case, prior to executing the Loan and Distribution Agreement, the Mahers promised to prioritize Playroom's sales, perform certain factoring and computer training services, and provide additional credit if necessary. (Am. Countercl. ¶¶ 48(b)—(e).) Rowen alleges that the Mahers intended these oral promises to fraudulently induce him to execute the Loan and Distribution Agreement. (Am. Countercl. ¶ 51.) These promises are unmistakably part of the Distribution Agreement, because they could only have arisen in relation to the terms of the written agreement. They were not, however, memorialized in the written agreement, so they are properly understood as "extra-contractual representations . . . in a credit agreement." *VR Holdings*, 2002 WL 356515, at *3. Accordingly, the ICAA prohibits Rowen from bringing a claim based on these promises.

Rowen also claims Defendants made certain alleged misrepresentations regarding accounting services after the execution of the Distribution Agreement, for the purpose of fraudulently inducing him "to fire Playroom's bookkeeper and allow Marilyn Maher to oversee and handle Playroom's financial record-keeping." (Am. Countercl. ¶¶ 48(a), 50.) As with the

8

oral promises prior to execution, these promises are inextricably bound with the terms of the written agreement. Playroom's accounting methods were a condition of the parties' credit agreement. (Am. Countercl. ¶ 23 ("In order for Playroom to enter into the Loan Agreement with the Mahers, the Mahers required that Playroom move onto ACD's accounting inventory and overall customer relationship management software, MAS 500.").) Thus, the subsequent oral promises or alleged misrepresentations changing Playroom's accounting methods amount to an "agreement by a creditor to modify or amend an existing credit agreement." 815 ILCS 160/3. Therefore, Rowen may not bring a claim for fraud based on these oral promises.

Because the oral promises underlying the fraud claim either modify or form a part of the parties' credit agreement as defined by the ICAA, we grant the Mahers' motion to dismiss Count I of Rowen's amended counterclaim.

## II. Tortious Interference with a Contract Claim (Count IV)

In support of his tortious interference with a contract claim, Rowen argues that the Mahers "intentionally and unjustifiably" induced ACD to breach the Distribution Agreement with Rowen. The Mahers argue that Count IV should be dismissed because it is barred by the ICAA. Alternatively, they state that Count IV should be dismissed because Rowen failed to plead that it delivered sufficient products to ACD, which they allege is a necessary element of a tortious interference claim based on a consignment model contract.

### A. The ICAA's Applicability to Rowen's Tortious Interference Claim

First, we address the ICAA's applicability to Rowen's tortious interference claim. Unlike the fraud and conspiracy claims, the tortious interference claim is not based on any alleged oral promise related to the credit agreement. Rowen claims that the Mahers encouraged

9

their son, Maher Jr., to intentionally refrain from selling Playroom's products, in violation of the Distribution Agreement. This claim is based entirely on the Mahers' alleged actions inducing ACD to breach its contract with Rowen. It does not rely for its existence on an unwritten credit agreement or an oral modification to an existing credit agreement. Therefore, this claim is not barred by the ICAA.

### B. The Sufficiency of Rowen's Tortious Interference Claim

Next, we address the Mahers argument that Rowen has failed to allege that Playroom delivered sufficient products to ACD. The Mahers argue that Rowen must plead delivery by Playroom as a necessary element of his tortious interference claim. The Mahers contend that without this allegation there can be no breach by ACD, and thus no interference by the Mahers. To plead a cause of action for tortious interference with a contract under Illinois law, a plaintiff must allege: "(1) the existence of a valid and enforceable contract between the plaintiff and another; (2) the defendant's awareness of this contractual relation; (3) the defendant's intentional and unjustified inducement of a breach of the contract; (4) a subsequent breach by the other, caused by the defendant's wrongful conduct; and (5) damages." *Voelker v. Porsche Cars North Am., Inc.,* 353 F.3d 516, 527–28 (7th Cir. 2003) (citing *HPI Health Care Servs., Inc. v. Mt. Vernon Hosp.*, 131 Ill.2d 145, 155, 545 N.E.2d 672, 676 (Ill. 1989).

The Mahers' argument attacks the fourth element of the cause of action. They argue that Rowen must allege and prove that Playroom delivered sufficient products to ACD as part of his tortious interference complaint. In support of this proposition the Mahers mistakenly rely on *Scentura Creations Inc. v. Long.*, 325 Ill. App. 3d 62, 756 N.E.2d 451 (2d Dist. 2001).

Though *Scentura* dealt with a consignment model relationship, the facts of that case were substantially different than those before us. The consignment model relationship at issue in *Scentura* was a "pyramid scheme" or "chain referral sales technique" in which consignees were compensated based on their ability to bring additional consignees into contractual relationships with the consignor. *Scentura*, 325 Ill. App. 3d. at 68, 756 N.E.2d at 474. Although the plaintiff/consignor in *Scentura* did allege that it had delivered merchandise to the defendant/consignee in its complaint, the court never held that this was a necessary element of its breach of contract claim. All the court held in *Scentura* was that the contract at issue was void for violating state public policy regarding pyramid schemes. *Id*. at 72, 756 N.E.2d at 477.

Furthermore, the Mahers' argument that Rowen is required to plead Playroom's full performance under the contract conflates a breach of contract claim with a tortious interference claim. Under Illinois law, a plaintiff alleging tortious interference with a contract only needs to plead "a subsequent breach by the *other*," and not his own performance. *See HPI Health Care Servs., Inc.,* 131 Ill.2d at 155, 545 N.E.2d at 676 (emphasis added). Rowen has alleged a breach by ACD in that it failed to use commercially reasonable efforts to sell and promote Rowen's products. The Mahers' argument goes to the merits of Rowen's breach claim against ACD and as such is not an appropriate basis for dismissal under Rule 12(b)(6).

Rowen's claims also satisfy the other elements of a tortious interference claim. He alleges, and Defendants do not dispute, the existence of a valid and enforceable contract between it and ACD. (Am. Countercl. ¶ 70.) Rowen further alleges that the Mahers were aware of the contractual relationship between Rowen and ACD, and in fact required that Rowen enter into the Distribution Agreement with ACD. (*Id*. ¶¶ 20, 27, 71.) Although Rowen does not provide many

11

facts to support his claim that the Mahers intentionally induced ACD to breach the Distribution Agreement, there is enough in the counterclaim, construing all inferences in favor of Rowen, to pass muster at this early stage. For example, Rowen states that its sales in the third and fourth quarters (immediately after it entered into the agreement with ACD) were substantially lower than usual for that time of year. (*Id*. ¶ 28.) Rowen claims that the Mahers told their son Robert Maher Jr. to stop selling Rowen's products, and that ACD did in fact intentionally stop selling them, in breach of the Distribution Agreement. Finally, Rowen alleges that it was damaged by a reduction in sales that it would have otherwise made had ACD not breached the Distribution Agreement. Rowen has therefore stated a valid claim for tortious interference with a contract. Accordingly, we deny the Mahers' motion to dismiss Count IV of Rowen's amended counterclaim.

### III. Conspiracy in Restraint of Trade Claim (Count II)

In Count II, Rowen alleges that the Mahers and Maher Jr. conspired to force Playroom to default on the Loan so that they could acquire Playroom's assets. In support of this claim, Rowen states that the Mahers and Maher Jr. intentionally held Playroom's products in inventory and failed to uphold their promises to perform certain accounting and other tasks. (Am. Countercl. ¶ 62.) Rowen alleges that these actions restrained trade because they "nearly erased Playroom's presence in the national hobby/game market." (Am. Countercl. ¶ 63.) The Mahers argue that Rowen's counterclaim is insufficiently pled because it fails to identify a market and fails to allege that the counter-defendants have market power.[2] (Mem. at 12.)

---

[2] The Mahers also argue that Rowen's conspiracy in restraint of trade claim is barred by the ICAA. We need not reach this issue since we find Rowen's failure to plead an anti-trust injury dipositive.

Rowen brought the conspiracy claim pursuant to statutory provisions in the Sherman Act. Rowen seeks damages pursuant to 15 U.S.C. § 15(a) based on the Mahers' and Maher Jr.'s alleged conspiracy in violation of 15 U.S.C. § 1. A plaintiff alleging a violation of § 1 of the Sherman Act must plead and prove: "(1) a contract, combination, or conspiracy; (2) a resultant unreasonable restraint of trade in [a] relevant market; and (3) an accompanying injury." *Agnew v. Nat'l Collegiate Athletic Ass'n*, 683 F.3d 328, 334–35 (7th Cir. 2012) (quoting *Denny's Marina, Inc. v. Renfro Prods., Inc.*, 8 F.3d 1217, 1220 (7th Cir. 1993). The Sherman Act is intended to protect consumers from anti-competitive behavior. "Thus, the plaintiff must allege, not only an injury to himself, but an injury to the market as well." *Car Carriers, Inc. v. Ford Motor Co.*, 745 F.2d 1101, 1107 (7th Cir. 1984); *see also Juneau Square Corp. v. First Wis. Nat'l Bank of Milwaukee*, 624 F.2d 798, 811 (7th Cir. 1980) (stating that "[t]he Sherman Act requires more than mere injury to a competitor. Plaintiffs must show also that the effect upon competition in the marketplace is substantially adverse.") (internal quotations omitted).

Rowen has failed to meet the threshold requirement of pleading an antitrust injury. Although Rowen has alleged an injury to Playroom as a result of the Mahers' actions, he has not provided enough facts from which we may infer an injury to consumers. Rowen states that Playroom has lost sales and that Maher Jr. and ACD are now able to monopolize the market chain for Playroom's products. But an injury to Playroom alone does not constitute a valid antitrust claim. Rowen has stated that Playroom is part of the hobby/game industry, but has provided no facts regarding Playroom's market share or the projected impact the Maher's action will have on the hobby/game market. Because Rowen failed to allege any impact on market competition or injury to consumers, we hold that his conspiracy in restraint of trade claim fails to

state a claim on which relief may be granted. *See Agnew*, 683 F.3d at 334–35; *Wagner v. Magellan Health Servs., Inc.*, 121 F. Supp. 2d 673, 682 (N.D. Ill. 2000) ("Without any allegation as to how market-wide competition will be affected, the complaint fails to allege a claim on which relief may be granted."). Accordingly, we grant the Mahers' motion to dismiss Count II of Rowen's amended counterclaim.

## IV. Breach of Contract Claim (Count III)

In Count III, Rowen claims that the Mahers breached the terms of the Loan by failing to disburse the final installment of $65,000. The Mahers argue that they were justified in withholding this payment because they had alerted Rowen that he was in "possible default." Essentially, the Mahers' assert that they were excused from disbursing these funds under the terms of the Loan. However, our inquiry at this stage is limited to the sufficiency of Rowen's pleading. Therefore, we focus only on the facts alleged in the counterclaim to determine if Rowen has adequately pled his breach of contract claim. To plead a cause of action for breach of contract under Illinois law, a plaintiff must allege: "(1) the existence of a valid and enforceable contract; (2) substantial performance by the plaintiff; (3) a breach by the defendant; and (4) the resultant damages." *Fednav Int'l Ltd. v. Cont'l Ins. Co.*, 624 F.3d 834, 839 (7th Cir. 2010) (quoting *W.W. Vincent & Co. v. First Colony Life Ins. Co.*, 351 Ill. App. 3d 752, 759, 814 N.E.2d 960, 967 (1st Dist. 2004)); *Reger Dev., L.L.C. v. Nat'l City Bank*, 592 F.3d 759, 764 (7th Cir. 2010).

Rowen alleges, and the Mahers do not dispute, that the Loan and other related documents constitute a valid contract. (Am. Countercl. ¶ 26.) Rowen also sufficiently pleads a breach of the contract by the Mahers and resulting damages. Rowen states that the Mahers failed to pay

14

the final $65,000 due under the Loan, thereby breaching the contract.  (Am. Countercl. ¶ 66–67.)  He alleges Playroom's relationship with a particular German game licensor was damaged due to the Mahers' breach.  (Id. ¶ 34.)  Rowen has therefore sufficiently pled the first, second, and fourth elements of a breach of contract claim.

Rowen's claim that Playroom substantially performed all of its obligations under the contract is the only questionable element of his breach of contract claim.  In Count III, Rowen states simply that Playroom has performed all of its obligations under the Loan.  (Am. Countercl. ¶ 65.)  Although this statement standing alone is somewhat conclusory, we view the counterclaim in its entirety and look to other sections to see if he has offered any facts that support his alleged performance.  *See Murphy*, 51 F.3d at 717.  Earlier in the counterclaim, Rowen states that Playroom has made and continues to make every payment required of it under the Loan.  (Am. Countercl. ¶ 35–36.)  This allegation lends support to Rowen's claim that he has substantially performed under the contract.  Additionally, after receiving notice of possible default Rowen asked the Mahers what he needed to do to avoid defaulting and was told no action was necessary and the notice was just a warning.  (Am. Countercl. ¶ 35.)

Construing all inferences in Rowen's favor, as we must at this point, it is plausible that he substantially performed his obligations under the contract.  Accordingly, we deny the Mahers' motion to dismiss Count III of Rowen's amended counterclaim.

## CONCLUSION

For the reasons set forth above, the Mahers' motion to dismiss Counts I and II of Rowen's amended counterclaim is granted. The Mahers' motion to dismiss Counts III and IV of the amended counterclaim is denied. It is so ordered.

_____
Honorable Marvin E. Aspen
U.S. District Court Judge

Date: April 22, 2013