```
                    UNITED STATES DISTRICT COURT
                    NORTHERN DISTRICT OF ILLINOIS
                           EASTERN DIVISION



ROBERT P. MAHER and MARILYN      )
V. MAHER, individuals,           )    No. 12 C 7169
                                 )
            Plaintiffs,          )
                                 )    Judge Marvin E. Aspen
        v.                       )
                                 )
THE ROWEN GROUP. INC., d/b/a     )    Magistrate Judge
PLAYROOM ENTERTAINMENT, a        )    Arlander Keys
California corporation, and      )
DANIEL M.J. ROWEN, an individual,)
                                 )
            Defendants.          )
```

## **MEMORANDUM OPINION AND ORDER**

On September 7, 2012, Robert Maher and Marilyn Maher, husband and wife, filed this lawsuit against Daniel Rowen and the Rowen Group, a California corporation run by Mr. Rowen that does business as Playroom Entertainment. Playroom makes and sells niche toys and games, both on its own and through distributors, including a company called ACD, which is run by the Mahers' son, Robert Maher, Jr. In their complaint, the Mahers allege that Mr. Rowen and Playroom violated various provisions of a loan agreement the parties executed on June 30, 2011.

When they filed their complaint, the Mahers also filed an emergency motion seeking the appointment of a receiver. In their motion, the Mahers claimed that Mr. Rowen was liquidating

inventory and otherwise diminishing the value of the assets that served as collateral for the Mahers' loan. After hearing testimony and considering the parties' arguments, the Court disagreed, and, on September 28, 2012, issued a Memorandum Opinion and Order denying the plaintiffs' emergency motion for a receiver.

One year later, the case is back before the Court on the same issue. On September 23, 2013, the Mahers again moved for the appointment of a receiver. At about the same time, they also filed a motion for entry of judgment and a motion for sanctions pursuant to Rule 37(b)(2). After Judge Aspen referred the motions, the Court held an evidentiary hearing on October 11, 2013. At that time, the parties appeared with counsel, and the Court heard testimony from both plaintiffs, as well as Mr. Rowen. Counsel also offered argument on the various motions presented, and the Court took the case under advisement. After considering the testimony of the witnesses and the arguments of counsel, the Court finds that the appointment of a receiver still is not warranted. Accordingly, the Court denies the Mahers' motion to appoint a receiver.[1]

## Discussion

"Federal courts have an inherent equitable power to appoint

---

[1] The motion for sanctions and the motion for entry of judgment are addressed in another Memorandum Opinion and Order issued today.

2

a receiver to manage a defendant's assets during the pendency of litigation." *Matter of McGaughey*, 24 F.3d 904, 907 (7th Cir. 1994)(citations omitted). "[T]he primary consideration in determining whether to appoint a receiver is the need to protect, conserve and administer property pending final disposition of a suit"; thus the remedy is especially appropriate "in cases involving fraud and the possible dissipation of assets." *Jackson v. N'Genuity Enterprises Co.*, No. 09 C 6010, 2011 WL 4628683, at *8 (N.D. Ill. Oct. 3, 2011)(citing *McGaughey*, 24 F.3d at 907).

In connection with their first receivership motion, the Mahers argued that Mr. Rowen had committed fraud and that he was dissipating Playroom's assets. After hearing the testimony of Mr. Maher and Mr. Rowen, the Court disagreed. This time around, the Mahers again imply that Mr. Rowen is being less than fully transparent in his operations, that he is continuing to dissipate assets and inventory and otherwise conducting himself in a manner that devalues the company.

The Mahers' current motion is largely the same as their last motion; in it, they argue that they made the loan to Playroom based upon what turned out to be fraudulent misrepresentations made by Mr. Rowen. But the Court rejected this argument the first time around, and the Mahers have really offered nothing new to justify changing that earlier ruling. To a large extent, the Mahers hang their hat this time on what they believe were certain

wrong impressions held by the Court. In its earlier decision, the Court noted that Playroom's licenses remained intact and that Playroom expected higher fourth quarter earnings in 2012. The Mahers argue that neither of those things was true. And, at the hearing on October 11, 2013, they offered evidence (Mr. Maher's testimony and some documentary evidence prepared by him) to show that, in fact, Playroom has lost licenses and lost significant revenue along with those licenses, and that Playroom, in fact, earned much less than projected in the last quarter of 2012.

With regard to licenses, Mr. Maher testified at the October 11 hearing that he recalled Mr. Rowen testifying at his 30(b)(6) deposition that Playroom lost several licenses. More specifically, in their motion, the Mahers claim that the licenses associated with Schmidt Spiele products were "terminated because Playroom failed to make the required payments and to otherwise comply with the applicable license agreements." Plaintiffs' Emergency Motion for the Appointment of a Receiver, p. 5. Mr. Maher testified that he used Mr. Rowen's deposition testimony to make a list of "lost licenses" and then used the MAS 500 System to generate a document showing how much revenue Playroom lost as a result of losing the licenses identified by Mr. Rowen. *See* Exhibit 10. Mr. Maher testified that, as is clear from Exhibit 10, Playroom lost $161,633.02 in revenue due to the loss of licenses. Thus, rather than giving the Court comfort, he argues,

4

the status of Playroom's licenses weighs in favor of appointing a receiver.

Yet, when Mr. Rowen took the stand, he painted a very different picture with respect to Playroom's licenses. First, he testified that Playroom has acquired several new licenses since the last hearing, including "Slangology" and "Say What You Meme" (both acquired in August 2013); and "Quick Slap!" – a new brand to replace Halli Galli. Additionally, he testified that, some of the licenses Mr. Maher included on his list of "lost licenses" were not, in fact, "lost" – they may have been released or sold as part of an overall business strategy to get rid of unproductive licenses and to acquire and maintain licenses for products that are cost effective and likely to make the company profitable. For example, with respect to the Ligretto licenses, Mr. Rowen testified that "Ligretto" is a "vehicle" for other brands, which expands the reach into the hobby game market; to get another license to put on the Ligretto license would have been expensive, and since the Ligretto license was going to expire at the end of 2013 anyway, they sublicensed it – and, in the deal, got a $20,000 advance and the rights to royalties for up to 10 years; plus Playroom got to sell all of its Ligretto inventory. Mr. Rowen testified that Playroom also sublicensed another license in the Ligretto deal and got a $15,000 advance on that. He testified that "Pass the Pandas!" is another example,

5

and that these deals were all part of a business decision made to make Playroom more profitable. Mr. Maher's "lost license" information, he testified, is just wrong and fails to take into account some pretty important information.

Mr. Rowen's testimony at the October 11 hearing is consistent with his deposition testimony. *See* Exhibit 9, Transcript of Mr. Rowen's 30(b)(6) Deposition taken June 21, 2013. Counsel for the Mahers tried to impeach Mr. Rowen on the license issue and tried to suggest that his deposition testimony contradicted what he was saying at the hearing. But it does not. When asked about licenses at his deposition, Mr. Rowen testified that Playroom "no longer [has] licenses for" certain products; he never said Playroom lost those licenses. Exhibit 9, pp. 73-74. It is true that Mr. Rowen did not mention any sublicense or royalty arrangements at that time, but it is also true that counsel never asked him about sublicenses or royalties and never asked follow up questions concerning the circumstances of the licensing changes. And, in any case, it is clear that Exhibit 10 assumes that all of the listed licenses were "lost," taking any potential revenue with them – and that would appear not to be the case.

In fact, putting aside the question of whether the listed licenses were lost because of Playroom's failure to pay or disposed of in some other, more profitable manner, the evidence

6

shows, unequivocally, that Playroom seems to have gained far more than it lost in the way of licenses. When asked at his deposition about licenses Playroom has added since January 1, 2011, Mr. Rowen testified that:

> Playroom is in the process of finalizing a license for Puff the Magic Dragon board game and card game . . . . We have the license for The Lord of the Rings card game. We have the license for The Hobbit board game. We got the license for Geek Out!. Say What you Meme, M—e—m—e. Words of Art, although we will change the title and release it in 2014. Slangology. We got the license for Quick Slap!. We're working on finalizing the rights to the license for ZaZool. We renewed the license for Catz, Ratz & Batz, which we originally had in 2002. We got the license for Pass the Pandas. Did a brand extension for the Wild Horses license that we already had and created Fast Lane. We licensed 4 Letter Words. We continued the license for Trickery, which we never produced but originally licensed probably in 2006 or 2007. . . . [A]s I think you can see, while some things were removed, we've added a ton of great product.

See Exhibit 9 (Mr. Rowen's 30(b)(6) Deposition), pp. 76-77. The Mahers do not mention this evidence, but it would seem to undermine their claim that Mr. Rowen is running the company into the ground.

Fourth quarter 2012 revenue is another issue on which the evidence fails to completely support the Mahers' position. Mr. Maher and his attorney repeatedly suggested that Mr. Rowen projected sales of $800,000 in fourth quarter 2012. But looking at the transcript from the last hearing, it is clear that he did not. Specifically, Mr. Rowen testified that 4th quarter earnings are "more like 70 percent plus of the year's revenue. . . ."

7

Transcript, p. 120. He testified "the toy industry has been down for us as well. So while the first quarter was about 93,000, we are now at about 400,000, and I still have projections of probably 800,000 in sales. So that's how significant I believe the fourth quarter to be." Transcript, pp. 123-124. Thus, he did not testify, as the Mahers suggest, that Playroom would generate $800,000 in sales in the fourth quarter of 2012; he testified that total sales for the year were projected to be $800,000. And, although it is true that Playroom's sales still fell short of his projection, it was a projection – not a promise; it can hardly be the basis of a fraud claim.

The Mahers introduced evidence showing that Playroom's financial statements reflect inaccuracies and problems. But the evidence also suggests that some, if not all, of those inaccuracies and problems may be attributed to issues involving the MAS 500 System and Playroom's transition to that system from QuickBooks. Using reports he had run from the MAS 500 System, Mr. Maher identified problems with Playroom's accounting practices and financial statements. But Mr. Rowen was able to explain why the reports Mr. Maher ran were misleading. And the Court finds him to be a very credible witness.

The question of inventory is also a mixed bag. The Mahers introduced as exhibits a number of reports Mr. Maher testified he had generated based on information from the MAS 500 System, an

8

integrated accounting system he thinks highly of and which is used by his son's company, ACD, where his wife Marilyn is the CFO. *See* Exhibits 1, 2, 3, 15, 16, 17. The reports introduced by the Mahers are summaries generated by the MAS System and derived from information that is put into the system on behalf of Playroom – whether by Rebekah Zetty at Playroom's California offices, or by Marilyn Maher at ACD's Wisconsin offices.

Using these documents, Mr. Maher testified that, according to the balance sheet for September 30, 2012, Playroom had an inventory valued at $400,890.64; he further testified that the total inventory value as of December 31, 2012 was $356,820.58 – a decline of about $44,000. *See* Exhibit 1, tabs 2 and 3. What's more, he testified, even that lower number is misleading. Exhibit 15, according to Mr. Maher, is a standard report from the MAS 500 System showing inventory activity from September 13, 2012 through October 15, 2013. He testified that he caused Exhibit 15 to be prepared in response to Mr. Rowen's testimony at the last hearing, which gave the impression that he had inventory on hand that he wanted to move and that he had additional inventory coming in. According to Mr. Maher, Exhibits 15 and 16 show that Mr. Rowen's prior testimony was untrue. *See* Exhibits 15, 16. According to Mr. Maher, Exhibit 15 shows that, in the month following the last hearing, Playroom's inventory went down by $27,358.40.

9

With regard to inventory on hand at Playroom, Mr. Maher testified that Exhibit 16 shows that, even though inventory has declined over the past year, the value of the inventory Playroom has on hand is $285,012.26. He further testified, however, that about $16,000 of that inventory has been sitting there, unsold, for over a year, making it obsolete. *See* Exhibit 16, last page, column M. And that $167,873.12 of that amount is in excess of a 1-year supply (assuming constant sales from year to year), which diminishes its value. By way of explanation, he testified that, as a general proposition, inventory is valued at cost, but that, in some cases, the inventory is not even worth what Playroom paid for it because it's been sitting for so long; if the product hasn't sold in the past 12 months, why would you think it would sell in the next 12 months? In other words, Mr. Maher testified, the inventory valuation that appears on Playroom's financial statements is significantly overstated.

When Mr. Rowen took the stand, he testified that he had no idea how Mr. Maher made his "obsolete" and "in excess of 1-year supply" determinations. But that, after quickly glancing through Exhibit 16, he noted a number of inaccuracies. For example, he testified that the rights to some of the products listed ("Slangology"; "Say What You Meme") had just been acquired in August of 2013. And that, for those products, the one year sales numbers actually reflected just a couple of months of sales,

10

suggesting that Mr. Maher's "excess" numbers were skewed and inaccurate. Mr. Rowen testified that, for Slangology, Playroom had just received the product and had already moved 50% of the inventory; so too for Say What You Meme. Additionally, he testified, product is entered when the transaction is completed, not when the product actually arrives in Playroom's hands; thus, according to this chart, some of Playroom's inventory is "obsolete" according to Mr. Maher when, in fact, Playroom hasn't even received it yet. In short, Mr. Rowen testified, the chart creates a very misleading picture.

To be sure, it appears that the reports generated by the MAS 500 System are only as good as the information that is put into the system. And there is some evidence to suggest that what was put into the system was either incomplete or inaccurate. Mr. Maher testified that, in his view, the company's financial records, prepared using the MAS 500 System, are inaccurate. And, although it is clear that he believes Playroom's financial picture is less rosy than reflected in those reports, Mr. Rowen's testimony suggests that it is actually better than those reports indicate. For example, although the reports show that Playroom is carrying significant credit card debt and not making any attempts to reduce the card balances, Mr. Rowen testified that some of those cards should not even appear on Playroom's records because they are either closed or not related to Playroom's

11

business. He testified that these debts appear in MAS because of a mistake made in switching the company over from Quickbooks to the MAS 500 System – a mistake he is unable to change without Marilyn Maher's approval and input. Mr. Rowen testified that, with respect to MAS 500, Playroom is not permitted to change general ledger accounts, remove obsolete debt, or change inventory. This leads to inaccurate financial records. And they have to wait for Marilyn and ACD to take certain actions, which also creates a skewed picture.

    Based on the record before it, the Court is not persuaded that Playroom's long-term financial outlook is as dire as the Mahers contend. The evidence, as explained above, is, at best, mixed on the issue. But, having considered all of the arguments and evidence a second time, the Court is still left with the impression that, although Mr. Rowen may not be maintaining his books and records in the manner the plaintiffs would like him to, the Mahers' claim that he is running the business into the ground is not supported by the evidence.

    Additionally, based upon the evidence offered at the October 11 hearing, the Court is persuaded that, on balance, the appointment of a receiver would do more harm than good. At the October 11 hearing, the Court asked Mr. Maher how a receiver would help him and how it would help Playroom's business. He testified that, with a receiver, they would get everything put in

as it needs to be and documents that are needed would become available. He also testified that the appointment of a receiver would allow Mr. Rowen to devote 100% of his time to selling and dealing with vendors – his strengths; Mr. Maher testified that Mr. Rowen is a great salesperson, but he's a terrible bookkeeper and has no interest in doing it.

On the other hand, Mr. Rowen testified that, if the Court were to appoint a receiver, Playroom would immediately lose several of its licenses; he testified that several of Playroom's licenses – significantly, the licenses for the Hobbit and the Lord of the Rings products – would terminate immediately if the company were to go into receivership. And clearly a receiver would not be as familiar with the business as Mr. Rowen; nor would he have the same rapport and relationships with vendors, customers and manufacturers that Mr. Rowen – as Mr. Maher concedes – enjoys. And, although Mr. Maher thinks the appointment of a receiver would "free up" Mr. Rowen to spend all of his time selling and developing product lines, Mr. Rowen's commitment to and success in those areas might not be so strong if control of his company were forcibly wrested from him.

## Conclusion

Having determined that the evidence, at best, is a wash concerning Playroom's financial condition, and that the appointment of a receiver would do more harm than good, the Court

13

finds, once again, that the appointment of a receiver is not warranted. Accordingly, the Court denies the plaintiffs' emergency motion seeking the appointment of a receiver [#144].

Dated: November 12, 2013

ENTER:

_____
ARLANDER KEYS
United States Magistrate Judge