**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| ROBERT P. MAHER and<br>MARILYN V. MAHER,<br><br>Plaintiffs,<br><br>v.<br><br>THE ROWEN GROUP, INC., d/b/a<br>PLAYROOM ENTERTAINMENT,<br>and DANIEL M.J.ROWEN,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)    No. 12 C 7169<br>       Honorable Marvin E. Aspen |

**MEMORANDUM OPINION AND ORDER**

MARVIN E. ASPEN, District Judge:

Before us is a case that aptly illustrates the wisdom of Lord Polonius' advice: "Neither a borrower nor a lender be."[1]  Plaintiffs Robert P. and Marilyn V. Maher (collectively, "Plaintiffs" or "the Mahers;" individually, "Robert" and "Marilyn") brought suit against The Rowen Group, Inc., d/b/a Playroom Entertainment ("Playroom") and its president and founder, Daniel M.J. Rowen ("Rowen"), alleging numerous claims arising out of a loan made from the Mahers to Playroom.  Rowen had acted as guarantor for the loan.  Playroom and Rowen subsequently filed counterclaims against the Mahers, alleging that the Mahers had breached the loan agreements themselves and had committed tortious interference with a contract.[2]  Before us is the Mahers' Motion for Partial Summary Judgment ("MPSJ") with respect to Counts One and Two of their

---

[1] William Shakespeare, *Hamlet*, act. 1, sc. 3.
[2] Rowen and Playroom further levied allegations of fraud and conspiracy to restrain trade.  In April 2013 we dismissed these claims as barred by the Illinois Credit Agreement Act and failing to state a claim under the Sherman Act, respectively.  *Maher v. Rowen Grp., Inc.*, 12 C 7169, 2013 WL 1729483 (N.D. Ill. Apr. 22, 2013) (Dkt. 87).

complaint, alleging breaches of contract and guaranty against Playroom and Rowen, and with respect to Defendants' remaining counterclaims.  (Dkt. 179.)

Our efforts to resolve the MPSJ are complicated by numerous related motions filed by both parties that must be decided before we begin our analysis.  These motions include Defendants' Motion to Strike Robert Maher's Affidavit, (Dkt. 223), Defendants' Motion to Strike Robert Maher's Addendum Affidavit, (Dkt. 225), Plaintiffs' Motion to Strike Defendants' 56.1 Responses, (Dkt. 243), Plaintiffs' Motion to Strike Defendants' Additional Facts, (Dkt. 244), Plaintiffs' Motion to Strike Daniel Rowen's Affidavit, (Dkt. 245), Plaintiffs' Motion to Strike Rebekah Zetty's Affidavit, (Dkt. 246), Defendants' Motion to Strike New Facts and Arguments in Plaintiffs' Reply Brief, (Dkt. 265), and Plaintiffs' Motion to Strike Defendants' Addendum Response, (Dkt. 286).[3]  We address these motions in Part One of this opinion.

For the reasons discussed further below in Part Two, we deny Plaintiffs' MPSJ with respect to Plaintiffs' Count One and Defendants' Count Three, and grant the MPSJ with respect to Plaintiffs' Count Two and Defendants' Count Four.

## I.    PRELIMINARY MOTIONS TO STRIKE

Before we reach the merits of Plaintiffs' MPSJ, we must tackle the above-listed preliminary motions.  In determining whether summary judgment is appropriate, we consider only those facts and evidence that would be admissible at trial.  *Eisenstadt v. Centel Corp.*, 113 F.3d 738, 742 (7th Cir. 1997); *Allstate Ins. Co. v. St. Anthony's Spine & Joint Inst., P.C.*, 691 F. Supp. 2d 772, 777 (N.D. Ill. 2010).  In the case of affidavits or depositions, we consider testimony that would be admissible if given at trial.  Fed. R. Civ. P. 56(c)(4); *Eisenstadt*, 113 F.3d at 742.  In examining affidavits, we will strike only portions that are "clearly irrelevant,

---

[3] Additionally, Defendants filed a motion to amend their Rule 56.1 response and statement of additional facts, (Dkt. 267), which we hereby grant.

redundant, impertinent and prejudicial," so that we can retain the appropriate context in which to consider the claims and defenses before us. *C.L.U.B. v. City of Chi.*, 94 C 6151, 1996 WL 697630, at *1 (N.D. Ill. Nov. 20, 1996); *see also Adusumilli v. City of Chi.*, 164 F.3d 353, 359–60 (7th Cir. 1998); *Robinson v. Midlane Club, Inc.*, 94 C 1459, 1994 WL 577219, at *2 (N.D. Ill. Oct. 18, 1994). Both parties have raised numerous objections to the admissibility of parties' and witnesses' affidavits, as well as to portions of the facts and argument put forth in the MPSJ and in Defendants' responses. Keeping in mind the previously-stated principles, we examine each document in turn. Because they involve the evidence underlying the primary motion, we turn first to the objections surrounding the parties' and witnesses' affidavits, and then we address the motions to strike facts and argument in the primary briefing.

### A.      Robert Maher's Affidavit

In May 2014, Defendants filed a motion to strike portions of Robert's affidavit, which had been included as an exhibit to the Mahers' Rule 56.1 Statement of Undisputed Material Facts ("SUMF"). (Dkt. 223.) Defendants object to various portions of the affidavit on evidentiary grounds including lack of foundation, hearsay, and improper legal conclusions. Additionally, Defendants seek to strike large portions of Robert's affidavit testimony regarding Generally Accepted Accounting Principles ("GAAP") standards and compliance, arguing that the disputed portions constitute improper and inadmissible expert testimony.

With regard to Defendants' first category of objections, we will refuse to consider any content in the affidavit that would not be admissible at trial. We thus strike paragraphs 26, 31, and 46, as well as the fifth through seventh sentences of paragraph 41, as containing improper conclusions. (For example, Robert asserts in paragraph 26: "Marilyn and I as lenders had no obligation to continue making disbursements under the Loan pursuant to Section 9.4 of the Loan

Agreement.")  We also strike portions of the Mahers' SUMF that rely solely on evidence stricken from the affidavit, including parts of paragraph 20 containing legal conclusions, and paragraphs 25, 27, 31, and 75.  We are not persuaded by the remainder of Defendants' non-expert objections.  When the affidavit is considered in conjunction with the other evidence before us, there are no foundation or hearsay concerns.

Defendants' expert testimony objections present a thornier issue.  As the Mahers apparently concede, expert testimony is the appropriate vehicle for testimony regarding GAAP standards and violations.  *Danis v. USN Commc'ns, Inc.*, 121 F. Supp. 2d 1183, 1192 (N.D. Ill. 2000) (citing *Wikoff v. Vanderveld*, 897 F.2d 232, 235 (7th Cir. 1990)); *see also United States v. Turner*, 05 CR 355C, 2007 WL 1367597, at *1 (W.D. Wash. May 8, 2007) ("It also appears to be undisputed that expert testimony is generally required, or at least preferred, in order to prove the scope of [GAAP] as well as whether particular practices do—or do not—qualify as GAAP.").  Federal Rule of Evidence 702 explains that an expert witness may be qualified by "knowledge, skill, experience, training, or education."  There is no requirement that an expert hold any particular credentials to give expert opinion testimony.  *Smith v. Ford Motor Co.*, 215 F.3d 713, 718 (7th Cir. 2000) ("The court should also consider the proposed expert's full range of experience and training in the subject area."); *Tuf Racing Prods., Inc. v. Am. Suzuki Motor Corp.*, 223 F.3d 585, 591 (7th Cir. 2000) (holding that an accountant did not need to have a degree in mathematics or economics to testify as an expert regarding calculation of damages).

Nevertheless, an expert's testimony must be both relevant and reliable to be admissible.  Fed. R. Evid. 702; *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147, 119 S. Ct. 1167, 1174 (1999); *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589, 113 S. Ct. 2786, 2795 (1993).  The Seventh Circuit has imposed a two-step analysis, requiring first that evidence be established

as reliable by verifying that the expert "knows of what he speaks" and is not offering "subjective belief or unsupported speculation," and, second, that we determine that the evidence will assist us in understanding the evidence. *Cummins v. Lyle Indus.*, 93 F.3d 362, 367–68 (7th Cir. 1996) (citations omitted); *see also Pierce v. Chi. Rail Link, LLC*, 03 C 7524, 2005 WL 599980, at \*4 (N.D. Ill. Mar. 15, 2005) (extending the *Cummins* test to non-scientific expert testimony).

The evidence before us demonstrates that Robert holds considerable business experience, having worked in management review at an accounting firm and run multiple consulting firms. (Dkt. 180-1 (Robert Aff.) ¶¶ 10–13.) The precise nature of Robert's knowledge of and experience with accounting principles is unclear, although Magistrate Judge Keys permitted him to testify regarding Playroom's financial records and their compliance (or lack thereof) with GAAP in an evidentiary hearing related to another motion in this litigation.[4] (*Id.* ¶ 11.) In light of our ruling below, we need not fully assess Robert's expert qualifications and turn instead to review the helpfulness of his GAAP testimony.

In his affidavit, Robert states that he has reviewed Playroom financial records as accessed through MAS 500, a system that Playroom uses to record its financial transactions. (Robert Aff. ¶¶ 17–19; 21.) He recites a litany of errors that constitute GAAP violations; one typical example is his statement that, "[c]ontrary to GAAP, interest expense is not accrued." (*Id.* ¶ 21(g).) Similarly, Robert asserted at the hearing before Judge Keys that Playroom's financial statements were not up to GAAP, and upon a request for foundation simply stated: "There are entries in multiple areas off the financials that are either incorrect in their entry or they're not entered at all." (Dkt. 81 at 29.) Such generic assertions are not reliable and relevant in the manner required by *Daubert* and *Kumho*.

---

[4] At this hearing, Robert explained his business background, but neither he nor his attorney clarified that he sought to testify as an expert.

The Supreme Court has commented that there are numerous sources of GAAP rules and procedures. As the court has explained, "GAAP is not the lucid or encyclopedic set of pre-existing rules that the dissent might perceive it to be. Far from a single-source accounting rulebook, GAAP 'encompasses the conventions, rules, and procedures that define accepted accounting practice at a particular point in time.'" *Shalala v. Guernsey Mem'l Hosp.*, 514 U.S. 87, 101, 115 S. Ct. 1232, 1239 (1995) (adding further that "GAAP changes and, even at any one point, is often indeterminate. '[T]he determination that a particular accounting principle is generally accepted may be difficult because no single source exists for all principles.' . . . There are 19 different GAAP sources, any number of which might present conflicting treatments of a particular accounting question.") (internal citations omitted). Yet Robert does not identify a single source used to determine what may or may not be a GAAP requirement.

Regardless of whether his experience may qualify him as an expert, because Robert fails to identify any source or methodology beyond his own opinions, his testimony fails to meet the requirements of Rule 702. *See Clark v. Takata Corp.*, 192 F.3d 750, 758 (7th Cir. 1999). Without this information, his GAAP testimony is not helpful in assessing the evidence before us. Accordingly, we strike those portions of Robert's affidavit that purport to be expert GAAP testimony. These include paragraph 14, the second sentence of 21 and its subsections (e) through (k), the second sentence of 23, the final sentence of 42, and paragraphs 43 through 45. We also strike the corresponding portions of the Mahers' SUMF, including paragraphs 35 through 37, and 71 through 74, and the characterization of funds in paragraph 52.

For the reasons stated above, Defendants' motion to strike portions of Robert's affidavit is granted in part, and denied in part.

**B.      Robert Maher's Addendum Affidavit and Other Addendum Materials**

In April 2014, two months after filing the initial MPSJ, Plaintiffs filed an addendum asserting an additional breach of contract and including three additional undisputed material facts.  (Dkt. 198.)  Defendants filed a motion to strike the Mahers' addendum to the MPSJ, along with the accompanying addendum to their SUMF and Robert's addendum affidavit.  (Dkt. 225.) Defendants' arguments primarily raise a procedural objection that the Mahers filed their addenda materials without leave and in doing so exceeded the number of undisputed material facts allowed by Local Rule 56.1.  These procedural objections are moot, as we later granted leave to file.  (Dkt. 240.)  Defendants offer no substantive reasons for us to strike these materials. Defendants' motion to strike the addendum materials is denied.

Nonetheless, we reiterate that we will consider only evidence that would be admissible at trial.  Although Defendants do not argue as much, we note that some of the Mahers' additional facts meld fact with legal conclusion.  We will disregard all inappropriate conclusory statements made in the addendum filings and consider only the admissible facts presented.

**C.      Daniel Rowen's Affidavit**

On June 5, 2014, the Mahers filed a motion to strike portions of Rowen's affidavit. (Dkt. 245.)  The Mahers combined standard evidentiary objections with an additional legal issue—in this instance, whether portions of testimony should be barred by the Illinois Credit Agreement Act ("ICAA"), 815 Ill. Comp. Stat. 160.  We begin with the former set of objections.

**1.      Assorted Objections**

The Mahers contend that numerous portions of Rowen's affidavit testimony is unsupported by evidence, or contradicts other evidence in the record.  In particular, the Mahers assert that one portion of Rowen's affidavit contradicts his earlier testimony.  An affidavit

ordinarily may not be used to directly contravene earlier sworn testimony. *See Bank of Ill. v. Allied Signal Safety Restraint Sys.*, 75 F.3d 1162, 1168–69 (7th Cir. 1996) ("We have long followed the rule that parties cannot thwart the purposes of Rule 56 by creating 'sham' issues of fact with affidavits that contradict their prior depositions."). Still, a contradiction may be permitted if the affiant was confused at the time of the deposition or seeks to clarify deposition testimony. *Miller v. A.H. Robins Co., Inc.*, 766 F.2d 1102, 1104 (7th Cir. 1985) ("An inconsistent affidavit may preclude summary judgment, however, if the affiant was confused at the deposition and the affidavit explains those aspects of the deposition testimony.").

Here, the Mahers focus on what they claim is an inconsistency regarding how Playroom funded its first repayment to the Mahers. Rowen now states that he transferred personal funds to Playroom to make a repayment to the Mahers as guarantor of the loan from the Mahers to Playroom. (Dkt. 221-1 (Rowen Aff.) ¶¶ 34–36 (stating that he acted as guarantor but did not make a loan to Playroom).) According to the Mahers, this characterization contradicts Rowen's earlier deposition testimony regarding the payment, which the Mahers believe was a prohibited loan from Rowen to Playroom. At the deposition, when asked whether the payment to Playroom had been considered a debt owed to Rowen by Playroom, Rowen's responded: "I'm not sure how it was booked, but that sounds logical." (Dkt. 180-12 (June Rowen Dep.) at 125:16–17.) Although these two versions do not perfectly align, the affidavit and deposition testimony are not so contradictory as to warrant striking the affidavit, particularly given Rowen's apparent uncertainty at the deposition.

The Mahers' range of objections also includes those based on a lack of foundation, improper legal conclusions, and hearsay. A number of the Mahers' foundation and hearsay objections go more to the weight of the evidence than to their admissibility, and therefore do not

merit striking the statements in question.  *Simmons v. W. Suburban Kidney Ctr.*, 89 C 8264, 1991 WL 32759, at *3–4 (N.D. Ill. Mar. 6, 1991) (declining to strike statements of facts where objections went to the weight of the evidence rather than admissibility).  For example, the Mahers seek to strike paragraph 29 because Rowen's assertion "is not borne out by" the loan agreement.  (Dkt. 245 at 3.)  As with Robert's affidavit, we find that most of the objected-to statements are acceptable in the greater context of all the evidence.

We also conclude that paragraph 68 of Rowen's affidavit does not rely on hearsay to make its point.  Rowen mentions his phone conversation with a third-party, Margaret Teoh, about a standstill agreement.  Despite passing reference to her acquiescence, Rowen has personal knowledge of the existence of the standstill agreement that he negotiated.  The specifics of his discussion with Teoh are neither included in paragraph 68, nor necessary to his independent knowledge of the alleged ultimate agreement.  We decline to strike this paragraph, although we do not rely on any purported statement by Teoh.

We do strike, however, the third sentence of paragraph 27.  Therein, Rowen states that the Mahers' failure to continue funding the loan constituted a material breach of the relevant agreements.  This sentence plainly includes an improper conclusion and cannot be considered.

2. **Objections based on the ICAA**

The Mahers also contend that a large number of the statements in Rowen's affidavit are barred by the ICAA.  We previously determined that one of Defendants' counterclaims was barred by the ICAA, Illinois's super-Statute of Frauds, because it was premised on the notion that certain conversations between Robert and Rowen modified the terms of the loan agreement.  *Maher*, 2013 WL 1729483, at *3.  Plaintiffs apparently worry that Defendants are attempting to re-raise some of those arguments.

The ICAA forbids any debtor from maintaining an action on the basis of or related to any credit agreement[5] unless that agreement is written, contains the relevant terms and conditions of the agreement, and is signed by both the debtor and the creditor. 815 Ill. Comp. Stat. § 160/2. Furthermore, a debtor may not make a claim or raise a defense that a new agreement was created based upon:

> (1) the rendering of financial advice by a creditor to a debtor;
> (2) the consultation by a creditor with a debtor; or
> (3) the agreement by a creditor to modify or amend an existing credit agreement or to otherwise take certain actions, such as entering into a new credit agreement, forbearing from exercising remedies in connection with an existing credit agreement, or rescheduling or extending installments due under an existing credit agreement.

*Id.* § 160/3. The ICAA is broadly applied to claims arising under either contract or tort law, and is invoked even if only a portion of an agreement involves a loan or the extension of credit. *Help at Home, Inc. v. Med. Capital, LLC*, 260 F.3d 748, 754–55 (7th Cir. 2001); *First Nat'l Bank in Staunton v. McBride Chevrolet, Inc.*, 267 Ill. App. 3d 367, 372, 642 N.E.2d 138, 142 (4th Dist. 1994); *see, e.g.*, *In re Lois/USA, Inc.*, 264 B.R. 69, 113 (Bankr. S.D.N.Y. 2001). We have previously determined that the loan agreement at issue is a credit agreement under the ICAA.

Plaintiffs argue that Rowen's statements about the agreement and conversations he had with Robert about the agreement either violate the rule of § 160/3 or constitute "attempt[s] to lay a foundation for a barred defense." (*See* Dkt. 280-1, Ex. A.) Defendants point out that the ICAA, by its plain language, applies only to *claims* and not to the evidentiary landscape for summary judgment purposes. Defendants provide no additional support for this argument. While we have already stated that the ICAA applies here, we recognize that some aspects of Rowen's testimony regarding the formation of the agreement are critical to our understanding of

---

[5] For ICAA purposes, a credit agreement is "an agreement or commitment by a creditor to lend money or extend credit or delay or forbear repayment of money not primarily for personal, family or household purposes . . . ." 815 Ill. Comp. Stat. § 160/1(1).

the facts. If we were to strike every portion of the materials before us that could potentially be used to support a claim or defense barred by the ICAA, our record would be meager and we would lose significant context.

Nonetheless, because the ICAA applies in this case, Defendants may not raise arguments or defenses related to conversations between the parties, or other oral or written representations that do not meet the writing and signature requirements of the ICAA. Although we may permit some facts regarding oral or informal written agreements to better inform our understanding of the facts, particularly where these respond directly to the Mahers' allegations, we will not consider facts related solely to an argument or defense barred by the ICAA. The portions of the affidavit that we will not entertain include the second sentence of paragraph 17, paragraphs 20 and 21, the first sentence of paragraph 22, the second sentence of paragraph 30, the third sentence of paragraph 38, the clause beginning "and did not object" in paragraph 55, the second sentence of paragraph 65, the final sentence of paragraph 75, paragraph 77's mention of ACD's representation, and paragraph 78. This ruling affects related portions of the Defendants' Statement of Additional Undisputed Material Facts ("SAUMF"), including the second-to-last sentence of paragraph 3, all but the final sentence of paragraph 6, paragraphs 7 through 9, the final two sentences of paragraph 10, the third sentence of paragraph 14, the last sentence of paragraph 15, the first sentence of paragraph 24, the third and fourth sentences of paragraph 32, and the second sentence of paragraph 37. As delineated, Plaintiffs' motion to strike is granted in part, and denied in part.

**D.      Rebekah Zetty's Affidavit**

Along with their motion to strike portions of Rowen's affidavit, Plaintiffs moved to strike portions of the affidavit of Rebekah Zetty, a Playroom employee. (Dkt. 246.) They argue that

several paragraphs of her affidavit lack foundation, violate the Best Evidence Rule, contradict or are inconsistent with other evidence, or are irrelevant. The Mahers' reply brief tacks on additional objections, including an incorporation by reference of a list of sixteen paragraphs (the affidavit comprises twenty) that they contend violate the ICAA. (Dkt. 282; Dkt. 280-1 at 5–6.)

As a preliminary matter, we will not consider new arguments raised on reply. This sort of sandbagging is inappropriate, as "reply briefs are for replying, not for raising new matters or arguments that could and ought to have been advanced in the opening brief." *Ner Tamid Congregation of N. Town v. Krivoruchko*, 620 F. Supp. 2d 924, 929 (N.D. Ill. 2009); *see also Autotech Techs. Ltd. P'ship v. Automationdirect.com Inc.*, 235 F.R.D. 435, 437 (N.D. Ill. 2006) (collecting cases). For this reason, we decline to discuss Plaintiffs' later-raised ICAA arguments.[6]

Next, we do not find the Mahers' foundation arguments to be well-taken. Although Zetty's testimony is not rife with precise dates and times, it is reasonably supported by the information Zetty provides about her employment. (*See* Dkt. 221-3 (Zetty Aff).) Similarly, we do not find any improper conclusions in the affidavit. We are also not persuaded by the Mahers' arguments that some of Zetty's statements violate the Best Evidence Rule. In the context of an affidavit, the Best Evidence Rule does not apply to statements that are based on personal knowledge rather than knowledge of a document. *Waterloo Furniture Components, Ltd. v. Haworth, Inc.*, 467 F.3d 641, 648–49 (7th Cir. 2006); *Simmons v. Allsteel, Inc.*, 95 C 3049, 1999 WL 1045214, at *2 n.6 (N.D. Ill. Nov. 12, 1999). Here, the paragraphs cited by the Mahers appear to be primarily based on Zetty's personal knowledge of events or information that may

---

[6] In any case, we are not inclined to believe that the affiant's descriptions of her job duties and interactions with Marilyn and other ACD staff purport to create or modify any of the agreements at issue here.

also have been memorialized in writing (e.g., in email).  The Best Evidence Rule is not applicable in this instance.

The Mahers' remaining objections center on alleged conflicts between affidavit statements and other evidence before us, lack of probative value, and other permutations of relevancy objections.  Of course we may strike evidence that is clearly irrelevant, even statements in a Rule 56 affidavit.  *See, e.g.*, *Morissette v. Ghosh*, 08 C 2545, 2010 WL 1251443, at *2 (N.D. Ill. Mar. 23, 2010) (striking affidavits from persons with no personal knowledge of the facts of the case); *Ladenberger v. Gen. Signal Pump Grp./Aurora Pump*, 00 C 4054, 2001 WL 586497, at *2 (N.D. Ill. May 31, 2001) (striking affidavit statements regarding sex discrimination as lacking probative value in an age discrimination case).  But it is not our place on summary judgment to weigh the probative value of evidence, at the heart of the Maher's arguments.  *Washington v. Haupert*, 481 F.3d 543, 550 (7th Cir. 2007) (stressing that, at summary judgment, we "may not make credibility determinations, weigh the evidence, or decide which inferences to draw from the facts"); *Abdullahi v. City of Madison*, 423 F.3d 763, 773 (7th Cir. 2005) (noting that the court cannot "choose between competing inferences or balance the relative weight of conflicting evidence"); *see also Applegate v. United States*, 35 Fed. Cl. 406, 424 (Fed. Cl. 1996) (refusing to strike affidavit statements where "the contradictions [were] not of sufficient strength to require exclusion, but rather [were] open to reasonable interpretation such that they require explanation at trial"); *W. Suburban Kidney Ctr.*, 1991 WL 32759, at *3–4. We therefore deny the motion to strike Rebekah Zetty's affidavit, leaving these disputes to the trier of fact.

**E.  Plaintiffs' Motions to Strike Defendants' Responses to 56.1 Statement of Facts and Defendants' Additional Facts**

In addition to the motions concerning affidavits, the Mahers filed a motion to strike Defendants' response to the SUMF, (Dkt. 243), and a motion to strike Defendants' SAUMF, (Dkt. 244).  The Mahers insist that Defendants' materials should be stricken because they fail to comply with the requirements of Local Rule 56.1.  Specifically, the Mahers argue that Defendants' responses are not presented as "numbered paragraphs, each corresponding to and stating a concise summary of the paragraph to which it is directed," L.R. 56.1(b)(3)(A), and that Defendants' SAUMF fails to comply with 56.1(b)(3)(C)'s requirement of short and concise paragraphs.  They also assert that several of Defendants' responses are improper for a variety of substantive reasons—in many cases, because responses purporting to state a dispute do not effectively contradict the fact originally alleged.  We will not address the latter argument except to state that material facts that are not properly disputed will be deemed admitted. L.R. 56.1(b)(3)(C); *Smith v. Lamz*, 321 F.3d 680, 683 (7th Cir. 2003).  Nor will we address Plaintiffs' individual evidentiary objections, which are largely resolved by our rulings above on the motions disputing the Rowen and Zetty affidavits (Dkt. 245 and Dkt. 246).

As to the Mahers' more technical objection, we have the discretion to strike materials that do not strictly comply with the local rules.  *Brasic v. Heinemann's Inc.*, 121 F.3d 281, 285–86 (7th Cir. 1997) (collecting cases); *Fink v. Winnebago Cnty. Sheriff*, 99 C 50090, 2002 WL 221603, at *2 (N.D. Ill. Feb. 12, 2002) (striking in its entirety a response that consistently lacked citations, cited to items not in the record, or was not responsive); *Bell v. Potter*, 00 C 50014, 2001 WL 1636891, at *1 (N.D. Ill. Dec. 20, 2001) (striking a deficient statement of facts after proponent failed to correct deficiencies when given the opportunity).  We are not, however, obligated to require strict compliance.  *See, e.g.*, *Kelly v. Chambers*, 07 C 1005, 2009

WL 765267, at *3 n.11 (N.D. Ill. Mar. 23, 2009) (denying a motion to strike targeting paragraphs

that allegedly were too long or contained multiple facts); *Portis v. City of Chi.*, 510 F. Supp. 2d

461, 463 (N.D. Ill. 2007) (allowing a statement of facts containing paragraphs with technical

violations of the rule because they were understandable in context). Moreover, where technical

rule violations exist on both sides, "what's sauce for the goose is sauce for the gander," and

courts need not undertake to examine every paragraph of every filing. *Blackhawk Molding Co.,*

*Inc. v. Portola Packaging, Inc.*, 422 F. Supp. 2d 948, 952 (N.D. Ill. 2006); *see also Waldridge v.*

*Am. Hoechst Corp.*, 24 F.3d 918, 922 (7th Cir. 1994) ("[D]istrict courts are not obliged in our

adversary system to scour the record looking for factual disputes.").

We find the Mahers' claim that Defendants "make a mockery of Local Rule 56.1" to be a

gross overstatement. (Dkt. 244 at 1.) We are not persuaded by the argument that Defendants'

responses to Plaintiffs' SUMF violate Rule 56.1(b)(3)(A). Defendants respond to each

paragraph of Plaintiffs' SUMF in individual numbered paragraphs. Where the responses purport

to dispute the facts asserted, Defendants clearly state which allegations they dispute. The lack of

summary in some paragraphs is not so serious a violation as to warrant striking the response,

even in part. Nor do we find that Defendants' SAUMF violates Rule 56.1(b)(3)(C) to the point

that it must be stricken. Some paragraphs contain multiple facts, but they are logically grouped

and the combinations make sense in context, as in *Portis*.[7] Although we agree that Defendants

have committed some technical violations of the local rule, they are relatively minor, and striking

the materials would be unwarranted—particularly in light of Plaintiffs' own technical violations

of Rule 56.1. The motion to strike Defendants' SAUMF and the motion to strike Defendants'

response to Plaintiffs' SUMF are denied.

---

[7] Plaintiffs, too, are guilty of combining multiple facts in one paragraph. For example,
paragraph 33 of Plaintiffs' SUMF can be separated into at least four individual facts.

**F.     Defendants' Motion to Strike New Facts and Argument in Reply**

On June 23, 2014, Defendants filed a motion to strike what they allege are new facts and arguments in Plaintiffs' reply materials.  (Dkt. 265.)  Specifically, Defendants object to the two affidavits Plaintiffs appended in support of their responses to Defendants' SAUMF—one from Robert, and one from Matthew Becker.  (*See* Dkt. 248 (Resp. to Defs. SAUMF) & Exs. 1–2.)  Becker is an attorney who represents the holder of intellectual property rights to certain games formerly licensed by Playroom.  (Dkt. 248-2 (Becker Aff.) ¶¶ 2–8.)  According to Defendants, these affidavits constitute new facts (and/or legal argument) that are forbidden in a response to a 56.1 statement.  Plaintiffs respond that these are not new facts but constitute direct rebuttals of Defendants' stated facts.

Local Rule 56.1 prescribes the manner in which parties must present and respond to facts in a summary judgment proceeding.  Under Rule 56.1(a), when a non-movant's summary judgment response includes a statement of additional material facts requiring the denial of summary judgment, the moving party may respond as the non-moving party does to an initial statement of facts.  L.R. 56.1(a).  A response to additional facts should therefore comprise "a response to each numbered paragraph in the moving party's statement, including, in the case of any disagreement, specific references to the affidavits, parts of the record, and other supporting materials relied upon."  L.R. 56.1(b)(3)(B).

Parties moving for summary judgment are also forbidden from raising new arguments and asserting additional facts on reply.  *Centeno v. Wexford Health Sources Inc.*, 11 C 700, 2014 WL 5465477, at *5 (N.D. Ill. Oct. 16, 2014) (refusing to consider copies of prescriptions introduced with a reply memorandum because plaintiff would have no opportunity to respond); *Developers Sur. & Indem. Co. v. Kipling Homes, LLC*, 11 C 4457, 2013 WL 315960, at *3 (N.D.

Ill. Jan. 28, 2013) ("Our Local Rule 56.1, similarly, does not permit a moving party to argue facts in reply to the opposing party's facts or arguments when those facts are not included in the moving party's Local Rule 56.1(a) Statement."); *Premier Capital Mgmt., LLC v. Cohen*, 02 C 5368, 2008 WL 4378313, at *2 n.4 (N.D. Ill. Mar. 24, 2008) (rejecting movant's "supplemental statement of undisputed material facts" tendered on reply).  The driving force behind this approach is not to hinder presentation of the relevant facts, but to prevent a surprise addition of facts to which the non-movant has no opportunity to respond.  *Centeno*, 2014 WL 5465477, at *5; *Wigod v. Wells Fargo Bank*, 673 F.3d 547, 571 (7th Cir. 2012); *Padula v. Leimbach*, 656 F.3d 595, 605 (7th Cir. 2011); *see also Griffin v. City of Chi.*, 406 F. Supp. 2d 938, 942 (N.D. Ill. 2005) ("It is well settled that raising an issue for the first time in reply is improper, as it deprives the opposing party of a meaningful chance to respond.") (internal quotation omitted).

These principles do not, however, completely foreclose a summary judgment seeker's ability to supplement a response to a statement of additional facts with an affidavit or other evidence.  *See Beck v. Univ. of Wis. Bd. of Regents*, 75 F.3d 1130, 1134 n.1 (7th Cir. 1996).  As the Seventh Circuit commented in *Beck*, if "the reply affidavit merely responds to matters placed in issue by the opposition brief and does not spring upon the opposing party new reasons for the entry of summary judgment, reply papers—both briefs and affidavits—may properly address those issues." *Id.* (internal quotation omitted).  In fact, a plain reading of the rule suggests that affidavit support is permissible in this context.  L.R. 56.1(a), 56.1(b)(3)(B).

The alleged new facts and argument that Defendants challenge here appear in Plaintiffs' response to the SAUMF and its supporting materials.  (*See* Dkt. 248 & Exs. 1–2.)  Unlike the moving party in *Premier Capital Management*, the Mahers did not undertake to submit another statement of facts.  Instead, the affidavits and exhibits appear to be limited in scope to the new

facts that Defendants raised in their SAUMF. For example, the Becker affidavit appears at first glance to produce completely new facts—namely, that Becker's client sought to terminate a licensing agreement with Playroom. This information seeks to rebut Defendants' assertion that Playroom had not "lost" any licenses. (*See* Dkt. 248 ¶ 33.) Moreover, it seems unlikely that these "new" facts could come as any surprise to Defendants. The Becker affidavit and attached letter focus on a communication made to Playroom in April 2014. This licensing dispute therefore preceded the filing of Defendants' response by over a month. At no point do Defendants contest the truth of the affidavit or the authenticity of the letter regarding the license termination. In sum, the purportedly new facts respond squarely to those set forth by Defendants and do not constitute unfair surprise.[8] *See Beck*, 75 F.3d at 1134 n.1; *Griffin*, 406 F. Supp. 2d at 942. This motion to strike is denied.

## G.     Plaintiffs' Motion to Strike Defendants' Addendum Response

In July 2014, Plaintiffs filed a motion to strike Defendants' response to Plaintiffs' addendum to their motion for summary judgment. (Dkt. 286.) Plaintiffs filed this addendum in April 2014, asserting three additional undisputed material facts concerning an alleged additional breach of the contract. (Dkt. 198.) Defendants responded in June 2014, and Plaintiffs argue that the response should be stricken because it relies upon legal argument rather than record citations.

Legal argument in a Rule 56.1 response is not appropriate and cannot support a factual dispute for summary judgment purposes. *See Bordelon v. Chi. Sch. Reform Bd. of Trs.*, 233 F.3d 524, 528–29 (7th Cir. 2000) (upholding the striking of a 56.1 response that cited to portions of the record supporting legal argument rather than controverting material facts); *Barth v. Vill. of*

---

[8] We also see no reason to strike Robert's June 5, 2014 reply affidavit. That being said, we find the affidavit is only marginally relevant to our analysis. In addition, we will not rely on Robert's accounts of conversations with Rowen to the same extent we declined to rely on Rowen's account of the like. (*See* Part I.C.2.)

*Mokena*, 03 C 6677, 2006 WL 862673, at *3 (N.D. Ill. Mar. 31, 2006) (refusing to consider portions of the response consisting of legal argument); *Najieb v. William Chrysler-Plymouth*, 01 C 8295, 2002 WL 31906466, at *2 (N.D. Ill. Dec. 31, 2002) (striking "narrative sections and recitations of the standards governing summary judgment motions and other law"). We agree with the Mahers' assessment that all of Defendants' addendum responses, despite citations to the record, have the air of legal argument rather than fact.[9] We are somewhat sympathetic to Defendants' plight; as noted in Part I.B, the addendum itself ventures into the realm of legal conclusion. Nevertheless, we grant the motion to strike this response. To the extent that any facts in the addendum are separable and admissible, they are deemed admitted.

## H.    Summary

In conclusion, the various motions to strike are disposed of as follows. The motion to strike Robert's affidavit (Dkt. 223) is granted in part and denied in part. The motion to strike Robert's addendum affidavit and additional addendum materials (Dkt. 225) is denied. The motion to strike Rowen's affidavit (Dkt. 245) is granted in part and denied in part. The motion to strike Rebekah Zetty's affidavit (Dkt. 246) is denied. The motion to strike Defendants' response to the SUMF (Dkt. 243) is denied. The motion to strike Defendants' SAUMF (Dkt. 244) is denied. The motion to strike facts and arguments from Plaintiffs' response materials (Dkt. 265) is denied. The motion to strike Defendants' response to the addendum (Dkt. 286) is granted.

---

[9] For example, in their response to ¶ 81, Defendants state: "First, Plaintiffs are not entitled to enforce any requirements of repayment under the Loan Agreement or Note as they failed to fund the entire amount of the Loan to Rowen." (Dkt. 255 ¶ 81.) The responses continue in this vein.

## II. SUMMARY JUDGMENT ANALYSIS

## A. Factual Background[10]

### *The Loan*

Playroom is a California corporation that licenses, manufactures, and markets tabletop games and other games and toys. (Pls.' SUMF ¶ 3; Rowen Aff. ¶ 7.) Rowen is the founder and president of Playroom. (Rowen Aff. ¶ 2.) Through his dealings in the game and hobby industry, Rowen became acquainted with the Mahers' son ("Bob Jr."), who is the president of ACD Distribution, LLC ("ACD"), a game distribution company. (*Id.* ¶ 9.) Marilyn is ACD's Chief Financial Officer. (Pls.' SUMF ¶ 33.) Robert has no official role at ACD, but has an ACD email address and has been known to offer business advice regarding the company.[11] (Dkt. 33 (Am. Countercl.) ¶ 12; Defs.' SAUMF ¶ 40.)

In December 2010, Rowen and Bob Jr. discussed a deal between ACD and Playroom by which ACD would receive a discount on Playroom products in exchange for loaning funds to Playroom. (Defs.' SAUMF ¶ 1.) No deal was struck between Playroom and ACD, but in early 2011, after Bob Jr. introduced Rowen and Robert, Rowen and the Mahers began discussing the possibility of a loan from the Mahers to Playroom. (Pls.' SUMF ¶ 9.) Negotiations commenced, and in April 2011 Robert traveled to California to visit Playroom's offices and review Playroom's available financial records.[12] (Defs.' SAUMF ¶ 4.) These records included a list of Playroom's outstanding debts and liabilities. (*Id.*; Resp. to Defs.' SAUMF ¶ 4; *see* Dkt. 1-1 (6/30/11 Loan Agreement ("the Agreement")) at 19–20.)

---

[10] Unless otherwise noted, the following facts are undisputed.
[11] The Mahers assert, perhaps unsurprisingly, that Bob Jr. does not always *follow* his father's advice. (Dkt. 248 ¶ 40; *see* Dkt. 248-1 (6/5/14 Robert Aff.) ¶ 25.)
[12] The records appear to have been in some disarray, and the parties disagree as to whether the Mahers were able to review all of the available financial records. (*See* Resp. to Defs.' SAUMF ¶ 4.)

The parties effected the Agreement on June 30, 2011, by which the Mahers would loan Playroom up to $500,000. (Pls.' SUMF ¶ 11; Agreement § A.) The loan was conditioned upon, among other things, Playroom's entry into an Exclusive Distribution Agreement ("EDA") with ACD. (Defs.' SAUMF ¶ 4; Agreement § 2.2.) In conjunction with the Agreement, the parties executed a Security Agreement and a Promissory Note in favor of the Mahers, and an Unconditional Guaranty Agreement (the "Guaranty") against Rowen. (Dkt. 1-2 (Security Agreement); Dkt. 1-3 (Promissory Note); Dkt. 1-4 (Guaranty).) The Mahers made their first payment to Playroom in the amount of $75,000 on June 20, 2011, before the Agreement went into effect. (Defs.' SAUMF ¶ 11.) To date, the Mahers have loaned Playroom a total of $435,000. (Pls.' SUMF ¶ 17.)

### Playroom's Financial Records

Under the Agreement, Playroom and Rowen made many representations and warranties and were bound by numerous affirmative covenants. For example, Playroom was required to keep its financial records in order and become GAAP-compliant by October 31, 2011. (Agreement § 5.2.) Because Playroom's financial records had not been up to date, Defendants began making efforts to revamp their accounting practices. Immediately after entering into the Agreement, Playroom hired a new bookkeeper to organize its records. (Defs.' SAUMF ¶ 14; Rowen Aff. ¶ 53.) This set-up did not last, and the bookkeeper left the company shortly thereafter. (Rowen Aff. ¶ 53.) After November 30, 2011, Playroom began using a financial accounting system called MAS 500 to book its financial transactions. (*Id.* ¶ 33; Defs.' SAUMF ¶ 15.) ACD operated MAS 500 from its own computer system, (Pls.' SUMF ¶ 33), and Playroom at least initially relied on Marilyn and ACD staff to input Playroom's financial information, (Defs.' SAUMF ¶¶ 15–16). Even after the transition to the MAS 500 system was

completed, Playroom's staff frequently sought assistance from Marilyn and others at ACD to properly book the company's transactions. (*Id.* ¶ 16.) In some instances, Marilyn and ACD did not allow Playroom to make or modify entries. (*Id.* ¶ 17.) Whether in spite of or because of Marilyn and ACD's involvement, Playroom has not consistently maintained up-to-date financial records. Indeed, Playroom admits that it was not GAAP-compliant by the deadline set in the loan agreement. (*Id.* ¶¶ 15–16.)

### *Playroom's Financial Needs*

In addition to issues arising out of the financial reporting process, the relationship between the parties deteriorated due to disputes and misunderstandings regarding the obligations under the Agreement. At the outset of the Agreement, Playroom had a number of outstanding debts and liabilities. (Pls.' SUMF ¶ 9; Defs.' SAUMF ¶ 5.) The Mahers contend that the loan funds were to be limited to the retirement of these already-existing debts, (Pls.' SUMF ¶ 9), while Defendants maintain that the loan funds could also be used at their discretion for "working capital purposes," (Dkt. 221 (Resp. to Pls.' SUMF) ¶ 9). In fact, the agreement provides that "proceeds of the Loan shall be used by [Playroom] for working capital purposes as approved by [the Mahers and Playroom] in their mutual discretion." (Agreement § 2.1.) In any case, when Rowen requested the final $65,000 available under the agreement, the Mahers declined to advance any funds.[13] (Defs.' SAUMF ¶ 31.)

### *Playroom's First Repayment*

At about the same time Playroom was requesting funds, Playroom's first payment to the Mahers came due. On April 5, 2012 (within the grace period defined by the Promissory Note), the Mahers received their first payment from Defendants. (Pls.' SUMF ¶ 19.) In the days

---

[13] As discussed further below, there is factual dispute as to whether and when Rowen requested the final funds, and for what purpose.

immediately prior to this first payment, Rowen had spoken to the Mahers regarding Playroom's financial status. Playroom had not had enough cash on hand to make the first payment. (Robert Aff. ¶ 22.) To make the required payment, Rowen deposited personal funds into Playroom's accounts. (Pls.' SUMF ¶¶ 51–52.) The Mahers have characterized this as a loan forbidden by the Agreement, (*id.* ¶¶ 52, 55; Agreement § 6.2), while Rowen insists that he made the payment as guarantor of the loan, (Defs.' SAUMF ¶ 27). The Mahers point to documents generated through the MAS 500 system to show that Playroom has made payments through an account listing current liabilities called "Due Rowan – Temporary." (Resp. to Defs.' SAUMF ¶ 27; Dkt. 248-1, Ex. C.) For his part, Rowen was initially unable to articulate how Playroom categorized his cash infusion[14] before explaining that he had acted in his role as guarantor. (June Rowen Dep. at 125:5–17; Defs.' SAUMF ¶ 27.) Under the terms of the Guaranty, Rowen waived "[a]ny and all rights to seek reimbursement from [Playroom] . . . in the event that [Rowen] makes or is required to make any payment to [the Mahers] pursuant to th[e] Guaranty." (Guaranty § 3(j).)

### *The Mahers Notice Possible Defaults*

The day after the Mahers received this first payment, Robert emailed Rowen to inquire about how Playroom had acquired the funds. In the same message, he informed Rowen that he believed Defendants to be in "a situation of 'Possible Default'" under several provisions of the loan, repayment notwithstanding. (Pls.' SUMF ¶ 20; Robert Aff., Ex. A.) Several months later, on August 20, 2012, Playroom and Rowen were served with notices of default and acceleration.

---

[14] When Rowen explained in a deposition that he had personally put money into the company for the first loan payment, the following exchange occurred:

    Q.    And that was listed as a debt owed to you by the company; is that right?
    A.    *I'm not sure how it was booked*, but that sounds logical.
(June Rowen Dep. at 125:14–17 (emphasis added).)

(Pls.' SUMF ¶ 21.)  The default and acceleration notices focused on numerous provisions of the Agreement.  In addition to disclosing its current liabilities and agreeing not to incur additional debt, Playroom made numerous warranties under the Agreement and assumed other duties regarding its financial situation.  For instance, Playroom agreed to pay all of its taxes and other government charges on an ongoing basis and to disclose any tax debts or other governmental obligations.  (Agreement §§ 5.1(a), 7.3.)  It had a continuing obligation to pay any other debts in full.  (*Id.* § 5.1(b).)  It agreed to use its best efforts to maintain financial records and was required to become GAAP-compliant within four months of the Agreement taking effect.  (*Id.* § 5.2.)  Playroom was also obliged to give written notice of either the institution or adverse determination of litigation or arbitration.  (*Id.* § 5.5.)  Among other things, failure to comply with these warranties and duties constituted a default under the Agreement.  (*Id.* §§ 8.4, 8.6, 8.7.)

### *Playroom's Debts*

Before entering into the Agreement, Rowen presented the Mahers with a list of numerous outstanding financial obligations ("Schedule 1").  (Defs.' SAUMF ¶ 5; Agreement at 19–20 (Schedule 1).)  Schedule 1 identified various debts and expenses totaling over $800,000, including due and past due royalties, office rent and parking, sales commissions and salaries, and past due loan payments.  (Schedule 1.)  It did not include any upcoming or overdue tax payments.  (*Id.*)  Playroom, however, did not file tax returns for 2008, 2009, and 2010 until December 2011, well after the Agreement was executed.  (Pls.' SUMF ¶ 59.)  Relatedly, in or around June 2012, the IRS notified Playroom that it owed $10,503, which remains unpaid.  (*Id.* ¶ 60; Resp. to Pls.' SUMF ¶ 60.)  Although Playroom argues that it does not owe this amount, it has not formally contested the charge.  (Pls.' SUMF ¶¶ 62–63.)

In addition, Playroom's non-governmental liabilities allegedly are not limited to those found in Schedule 1. According to the Mahers—even after the Agreement was executed and Playroom began receiving loan disbursements—Playroom accrued new debt while old debt continued to go unpaid. The Mahers claim that Playroom's liabilities aged over 120 days totaled $232,677.07 as of September 5, 2012, (*id.* ¶ 24), and increased to $307,134.04 by December 16, 2013, (*id.* ¶ 26). Defendants question the accuracy of the data relied upon by Plaintiffs, as taken from the MAS 500 system, but Defendants do not identify any specific errors. (Resp. to Pls.' SUMF ¶¶ 24, 26.) Defendants suggest, however, that the MAS 500 data is inaccurate because the Mahers had access to MAS 500, and because Defendants' MAS 500 printouts show different information about their liabilities. (*Id.*)

As some debts have gone unpaid, Playroom has ceased to produce certain games, including those owned by German game company Schmidt Spiele. (Pls.' SUMF ¶¶ 29–30.) According to Defendants, Playroom has in the ordinary course of business allowed some licenses to lapse so that it may acquire other licenses and focus its resources on better-selling products. (Defs.' SAUMF ¶¶ 33–34.) Defendants assert that, in making these business decisions, Playroom has "gained far more than it has released in the way of licenses." (*Id.* ¶ 34.)

### Playroom's Other Legal Troubles

In addition to its debts, Playroom has also had legal disagreements with some of its other business associates. Triways, a shipping company, filed suit against Playroom in March 2011. (Pls.' SUMF ¶ 43.) The Mahers claim that they did not receive written notice of the Triways lawsuit, (*id.* ¶ 44), although Rowen asserts that he provided Robert with a copy of the lawsuit during their April 2011 meeting, (Resp. to Pls.' SUMF ¶ 44). The litigation does not appear on Schedule 1, but the list does include a past-due debt to Triways of $29,327.42. (Schedule 1.)

Triways and Playroom settled the dispute for $29,177.42 on November 2, 2011. (Pls.' SUMF ¶ 43.) The terms of that settlement agreement ("Triways Agreement") require Playroom to make monthly payments to Triways, but Playroom is not currently- making payments. (*Id.* ¶ 48; *see also* Dkt. 180-3, Robert Aff., Ex. B (Triways Agmt.).)

The Triways suit is not the only legal action Defendants have faced. Although he did not provide details, Rowen stated in a deposition that, when he signed the Agreement, there had been threats of litigation against Playroom. (Pls.' SUMF ¶ 39; June Rowen Dep. at 34:17–22.) Mark Palmer, who had previously loaned money to Playroom, filed a lawsuit against Playroom in May 2012. (Pls.' SUMF ¶ 41.) Rowen did not provide the Mahers with written notice of the Palmer litigation, which was settled in July 2013. (*Id.* ¶ 42.)

### *Playroom's Sales Performance*

Following the execution of the Agreement, Playroom's sales were poor. (Defs.' SAUMF ¶ 23.) ACD's sales of Playroom products were lower than they had been before the EDA went into effect, and over time ACD's marketing efforts for Playroom products decreased. (*Id.* ¶ 24.) For example, ACD did not, as Playroom requested, include information about a specific Playroom game in its May 2014 trade magazine, but included outdated information regarding another Playroom game. (*Id.*; Rowen Aff. ¶¶ 82–83.) The parties agree that no one has ever explicitly told Rowen that the Mahers, in their capacity as CFO and unofficial business adviser of ACD (or simply as Bob Jr.'s parents), induced Bob Jr. to cause ACD not to promote Playroom products. (Pls.' SUMF ¶¶ 77–79.) Rowen's personal observations and discussions with some game retailers suggest, however, that ACD is not "pushing" Playroom products to their customers, including to retailers that had previously purchased Playroom products. (Resp. to Pls.' SUMF ¶ 80; Rowen Aff. ¶ 77; June Rowen Dep. at 191–94.)

*The Parties' Relationship throughout This Litigation*

Despite the problems running through the parties' relationship, Playroom continued to make repayments for the first two years of the Agreement. (Defs.' SAUMF ¶ 25.) By the time Defendants filed their MPSJ response in May 2014, Playroom had reduced its principal indebtedness from $435,000 to $265,693.24. (*Id.*) Because Defendants contend that they have not defaulted on the loan, and that the Mahers' demand for acceleration is thus improper, they have not repaid the entire loan amount. Instead, Playroom continued making quarterly payments through early 2014. Playroom, however, did not make a quarterly payment of $23,057.42 as due by March 31, 2014. (Dkt. 198 (MPSJ Addendum).) The Mahers then filed an addendum to their MPSJ, arguing that this missed March 2014 payment constituted an additional breach. (*Id.*)

Less than a month after sending the notifications of default and acceleration in August 2012, the Mahers filed this lawsuit, and Defendants responded with their counterclaims. As this litigation has progressed, the Mahers twice filed motions to appoint a receiver. (Dkt. 6; Dkt. 144.) Under the Agreement, the appointment of a receiver independently constitutes an event of default. (Agreement § 8.7(c).) Both of these motions were presented to Judge Keys, who denied them. (*See* Dkt. 23 (9/28/12 Op.); Dkt. 171 (11/12/13 Op.).)

**B.      Standard of Review**

Summary judgment is proper only when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine issue for trial exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 2510 (1986). This standard places the initial burden on the moving party to identify those portions of the record that "it believes demonstrate the absence of a genuine issue of material

fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 2553 (1986) (internal

quotations omitted). Once the moving party meets this burden of production, the nonmoving

party "must go beyond the pleadings" and identify portions of the record demonstrating that a

material fact is genuinely disputed. *Id.*; Fed. R. Civ. P. 56(c).

In deciding whether summary judgment is appropriate, we must accept the nonmoving

party's evidence as true, and draw all reasonable inferences in that party's favor. *Anderson*, 477

U.S. at 255, 106 S. Ct. at 2513. We do not "judge the credibility of the witnesses, evaluate the

weight of the evidence, or determine the truth of the matter. The only question is whether there

is a genuine issue of fact." *Gonzalez v. City of Elgin*, 578 F.3d 526, 529 (7th Cir. 2009) (citing

*Anderson*, 477 U.S. at 249–50, 106 S. Ct. at 2511). "Where the record taken as a whole could

not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for

trial." *Sarver v. Experian Info. Solutions*, 390 F.3d 969, 970 (7th Cir. 2004) (citations omitted).

## C.     Plaintiffs' Count One: Breach of Contract

Plaintiffs' Count One alleges that Playroom materially breached the Agreement by

defaulting under several of the Agreement's provisions, and by failing to cure these defaults or

pay the remaining indebtedness. In particular, the Mahers point to Sections 5.1, 5.2, 5.5, and 6.2,

which include covenants made by Defendants concerning Playroom's debts, financial records,

and involvement in legal proceedings.[15] The Mahers also rely on Sections 7.3 and 7.4, which set

forth several representations made by Defendants concerning Playroom's potential exposure to

---

[15] Generally speaking, Sections 5.1, 5.2, 5.5, and 6.2 include covenants that Defendants: (1) will pay taxes and any other government charges that come due, as well as any other liabilities that arise; (2) will keep true and complete financial records and become GAAP-compliant by October 31, 2011; (3) will provide written notice of either the institution or adverse determination of litigation, arbitration, or other proceedings; and (4) will not incur any additional debt without written consent.

litigation, as well as outstanding tax or other liabilities.[16]  Finally, the Mahers look to Sections 8.3, 8.4, 8.6, and 8.7, which define certain types of events that constitute a default under the Agreement.  For example, Section 8.3 states that an unremedied violation of any of the above-listed provisions amounts to a default.[17]  The Mahers argue that Defendants committed multiple defaults, entitling the Mahers to require accelerated payment in full under Section 9.  The Mahers seek damages, primarily for Defendants' failure to satisfy the demand for accelerated payment.[18]  (*See, e.g.*, Dkt. 181 (Pls.' MPSJ Mem.) at 5–11; Dkt. 242 (Pls.' MPSJ Reply) at 5.)

In Illinois, a successful breach of contract claim requires proof of the existence of a valid contract, the plaintiff's substantial performance of the contract, the defendant's breach of the contract, and damages.  *Fednav Int'l Ltd. v. Cont'l Ins. Co.*, 624 F.3d 834, 839 (7th Cir. 2010); *Reger Dev., LLC v. Nat'l City Bank*, 592 F.3d 759, 764 (7th Cir. 2010); *W.W. Vincent & Co. v. First Colony Life Ins. Co.*, 351 Ill. App. 3d 752, 759, 814 N.E.2d 960, 967 (1st Dist. 2004); *see RTP LLC v. ORIX Real Estate Capital, Inc.*, 13 C 350, 2014 WL 4414512, at *5 (N.D. Ill. Sept. 8, 2014).  The existence and validity of the Agreement is undisputed.  It is also clear that, assuming there was a material breach, damages arise from Defendants' failure to repay the accelerated loan principal and interest.  At issue is whether Playroom in fact breached the

---

[16] In Section 7.3 and 7.4, respectively, Defendants represent that: (1) no litigation was threatened or pending at the time the Agreement was effected and that all taxes had been timely filed and paid; and (2) other than items identified in Schedule 1 to the Agreement, there were no circumstances that would constitute a default or possible default.

[17] Sections 8.4, 8.6, and 8.7 further state that a default occurs if Defendants: (1) fail to pay or perform any obligation that material adversely affects Playroom's financial condition; (2) fail to satisfy, within 30 days, an adverse judgment of over $25,000; (3) fail to pay timely debts as they come due, unless the debt is disputed and the Mahers are given written notice; or (4) are adjudicated bankrupt or insolvent.

[18] The Mahers also assert that Defendants' failure to make the March 2014 quarterly payment constitutes a breach, aside from their claim that they were already entitled to full accelerated payment.  As discussed below, we need not address that theory.

contract, and whether the Mahers themselves performed their obligations so that they may enforce the Agreement.

### 1.    Breach

We turn first to the question of whether Playroom breached the Agreement.  We construe the Agreement to give effect to the intentions of the parties and interpret it as a whole to give effect to each provision as much as possible.  *Arrow Master, Inc. v. Unique Forming Ltd.*, 12 F.3d 709, 713 (7th Cir. 1993); *see also Nat'l Diamond Syndicate, Inc. v. United Parcel Serv., Inc.*, 897 F.2d 253, 256 (7th Cir. 1990) ("[I]f a contract is 'in writing, is unambiguous and contains no uncertain terms, interpretation of the contract is a question of law for the court,' and no evidence outside the four corners may be employed to construe its terms.").  Where the Agreement's terms are unambiguous, interpretation is a question of law.  *Arrow Master*, 12 F.3d at 713.  On the other hand, interpretation of any ambiguous provisions is a question of fact.  *Id.* at 714; *see also Citadel Grp. Ltd. v. Washington Reg'l Med. Ctr.*, 784 F. Supp. 2d 949, 958 (N.D. Ill. 2011).

As mentioned earlier, when arguing breach, the Mahers focus on events of default under the Agreement (under Sections 8.3, 8.5, 8.4, 8.6, and 8.7) that would permit the Mahers to accelerate repayment.  As we construe their briefs, the Mahers do not rely on the individual, underlying violations as material breaches of the Agreement.  (*See, e.g.*, Pls.' MPSJ Mem. at 5–11; Pls.' MPSJ Reply at 5.)  Rather, they contend that Defendants committed a material breach by failing to pay the full, accelerated debt.  In short, they seek to prove that defaults occurred to show their entitlement to seek accelerated payment of the debt in full—a payment that Defendants concededly did not make.  With that in mind, we turn to the Mahers' specific arguments.

### a. Claims of Default under Section 8.3

Under Section 8.3, Defendants are in default if they violate or fail to perform any covenant, condition, or other substantive provision of the Agreement. The Mahers allege that Defendants triggered this provision by violating Sections 5.1, 5.2, 5.5, 6.2, 7.3, and 7.4.

### i. Section 5.1

We begin with the alleged violations of Section 5.1, which addresses debts due after the Agreement's June 30, 2011 effective date. Section 5.1(a) requires Playroom to pay, "[p]rior . . . to the date when penalties would attach, all taxes, assessments and governmental charges and levies hereafter due" unless Playroom contests the charges in the specified manner. (Agreement § 5.1(a).) The Mahers argue that Playroom's late-filed taxes for 2008 through 2010 constitute a breach under this provision, because Playroom incurred a tax penalty that remains unpaid. (*See* Pls.' MPSJ Mem. at 6.) We will not resolve this issue for two reasons. First, although the returns were filed in December 2011, after the parties signed the Agreement, it is not clear when Playroom incurred the associated penalty, or whether that date matters. The parties do not explore, as either a legal or factual question, when the penalty associated with the late returns actually arose. Perhaps more importantly, the parties do not explicitly address whether the penalty—regardless of when incurred—should fall under Section 5.1(a) either because of the nature of the debt or because it remained "due" after June 30, 2011. Second, beyond these open issues, we need not evaluate this claim further because it does not change our analysis of the MPSJ. As such, we move on.

The Mahers also contend that Playroom violated Section 5.1(b) in at least two ways. (*See* Pls.' MPSJ Mem. at 6–7.) Under Section 5.1(b), Playroom must "pay in full . . . debts, obligations and liabilities incurred after" the execution of the Agreement. (Agreement § 5.1(b).)

In support, the Mahers assert that, based on their MAS 500 reports, Playroom's liabilities aged over 120 days increased more than $70,000 from September 5, 2012 to December 16, 2013. Defendants claim, based on Rowen's review of those documents and his testimony in proceedings before Judge Keys, that the MAS 500 reports prepared by the Mahers include mistakes and are unreliable.[19] (*See* Resp. to Pls.' SUMF ¶¶ 24, 26.) In light of the disputed evidence and the ultimate need for credibility determinations, we cannot conclude at this juncture that Playroom breached Section 5.1(b) for generally failing to pay debts in a timely manner.

Nonetheless, we conclude that the Mahers have proven a violation of Section 5.1(b) stemming from Playroom's failure to pay under the express terms of the Triways Agreement. It is undisputed that, pursuant to their written agreement dated November 2, 2011, Playroom settled a lawsuit filed by Triways for $29,177.42. (Triways Agmt.) As the Mahers contend, it is also undisputed that Playroom did not timely make all payments due under the Triways Agreement. To rebut that claim, Rowen testified that he negotiated a standstill agreement with Triways. (Rowen Aff. ¶¶ 67–68; Dkt. 221-4 (Dec. Rowen Dep.) at 245–47.) Defendants thus presumably argue that they did not violate Section 5.1(b) because payments to Triways were not "due" while suspended under the standstill. Rowen's testimony on this point is insufficient, however, because the Triways Agreement itself provides that its terms cannot be amended "without the written consent of all [p]arties." (Triways Agmt. ¶ 11.) Defendants have not provided any details about the standstill, let alone evidence of any consensual, written amendment to the pay structure set forth in the Triways Agreement. Defendants have not offered adequate evidence to create a triable question of fact about their excuse for the admitted failure to satisfy their

---

[19] Rowen further stated that Defendants are unable to correct errors in the MAS 500 system. (Rowen Aff. ¶ 45.)

obligations to Triways. As a result, we conclude that Playroom did not comply with Section 5.1(b).

ii.      **Section 5.2**

Section 5.2 requires Playroom to "[u]se its best efforts at all times to keep true and complete financial records and, by a date no later than October 31, 2011, shall keep such financial records in accordance with GAAP." (Agreement § 5.2(a).) This language is for the most part clear and unambiguous.

Regardless of whether Playroom ever achieved GAAP compliance—which remains disputed, as noted in Part I.A—Defendants acknowledge that Playroom did not meet the October 31, 2011 deadline.[20] Defendants indicate that Playroom transitioned to the MAS 500 system to become GAAP compliant but admit that it did not do so until after November 30, 2011. (*See* Defs.' SAUMF ¶¶ 14–19; Rowen Aff. ¶¶ 55–56; *see also* Zetty Aff. ¶ 4 (stating that Playroom began using MAS 500 around December 2011).) While we cannot resolve the Mahers' specific allegations of GAAP violations, Defendants' failure to meet this contractual deadline constitutes a plain violation of Section 5.2(a).

iii.      **Section 5.5(c)**

Under Section 5.5 of the Agreement, Defendants are required to give the Mahers prompt written notice of several events, including "the institution of, or adverse determination in, any litigation, arbitration or governmental proceeding . . . which would have a material and adverse effect upon [Playroom or Rowen]." (Agreement § 5.5(c).) The Mahers identify two alleged

---

[20] While Defendants dispute the reasons for the delay in transitioning to MAS 500, we previously held in Part I.C.2 that we will not consider Defendants' evidence of any oral modifications to the Agreement. (*See, e.g.*, Rowen Aff. ¶¶ 14–15 (stricken portions, noting that Defendants relied on Marilyn's representations that she would help them become GAAP-compliant and that Plaintiffs did not mind that Playroom missed the deadline while working to transition to MAS 500).)

violations of this provision. First, it is undisputed that Defendants did not give the Mahers written notice of the lawsuit filed by Mark Palmer against Playroom in May 2012, which was settled in July 2013. (Pls.' SUMF ¶¶ 41–42.) Such failure would constitute a breach if that lawsuit "would have a material and adverse effect" on Defendants. We find Section 5.5(c) to be ambiguous, however. For example, neither party specifically addresses whether the institution or resolution of the Palmer lawsuit falls under this provision as "material and adverse," terms left undefined by the Agreement. Additionally, while the Mahers' contend that Playroom's payment of the $25,000 settlement to Palmer constitutes an "adverse determination," (Pls.' MPSJ Reply at 8), reasonable minds could disagree.[21] Given these ambiguities, we cannot conclude that Defendants' failure to give notice violated this section.

Second, the Mahers claim that the Triways Agreement triggered notice under Section 5.5(c) because it "contained a provision for the entry of a stipulated judgment in favor of Triways." (Pls.' MPSJ Mem. at 8; Pls.' MPSJ Reply at 9.) This argument is unfounded. The Triways Agreement authorizes entry of a stipulated judgment against Playroom, if Playroom breaches that agreement without curing the default within a certain timeframe. (Triways Agmt. § 1.2.) There is no evidence in the record that Triways exercised its discretion under this provision. Because Triways did not file a stipulated judgment against Playroom, Defendants had no "adverse determination" (material or otherwise) to report under Section 5.5(c).[22]

---

[21] This reasoning applies equally to the Mahers' argument that Playroom's settlement payment to Triways was an "adverse determination" under Section 5.5(c). (Pls.' MPSJ Reply at 8.) Relatedly, the Triways Agreement represents "a compromise settlement" and states that the promises and payments thereunder shall not "be construed as an admission of liability" but are "intended to avoid further litigation and buy [Playroom] peace." (Triways Agmt. § 5.) This language, typical for such agreements, undermines the Mahers' theory.

[22] For the same reason, we reject the Mahers' additional argument that the Triways Agreement triggered a default under Section 8.6 of the Agreement, which defines "event of default" to include "a final judgment . . . for the payment of money in excess of the sum of $25,000."

#### iv.     Section 6.2

Next, under Section 6.2, Defendants are forbidden from incurring any additional debt without written permission from the Mahers.  (Agreement § 6.2.)  The Mahers argue that Defendants violated this provision when Rowen injected personal funds into Playroom so that Playroom could make a loan payment due to the Mahers.  (Pls.' MPSJ Mem. at 8; Pls.' MPSJ Reply at 9.)  Rowen insists that he made this payment as guarantor of the Agreement.  Rowen further explains that the payment could not have been a loan prohibited under Section 6.2 because the terms of the Guaranty preclude him from recouping those funds.  (Rowen Aff. ¶ 27.)  Because there is a fact question about whether Rowen transferred those funds as a loan to Playroom or as guarantor, we cannot find a breach of Section 6.2 at this stage.

#### v.     Section 7.3

Under Section 7.3 of the Agreement, Defendants represented that all of Playroom's taxes had been timely filed, that no extensions for tax filings had been sought, and that any exceptions had been disclosed to the lenders.  (*See* Agreement § 7.3(b).)  Citing Rowen's deposition testimony, the Mahers assert that Playroom failed to timely file tax returns for the years 2011 and 2012 in violation of this provision, which purports to continue beyond the Agreement's execution date.  (Pls.' MPSJ Mem. at 8–9; Pls.' MPSJ Reply at 9–10; Pls.' SUMF ¶ 65; *see* Agreement § 7 (noting that all representations and warranties "shall be deemed to be continuing and shall survive the execution . . . and the making of all Advances thereunder").)  In response Rowen states, without further evidentiary support, that "[a]ll of Playroom's taxes have either been filed, or extensions have been obtained."  (Rowen Aff. ¶ 71; *see* Resp. Pls.' SUMF ¶ 65.)

---

(Agreement § 8.6.)  Triways has not sought final judgment against Playroom for the settlement amount and, thus, Section 8.6 does not apply.

Given the record before us and our interpretation of the Agreement, we conclude that the Mahers have shown Defendants' breach. In Section 7, Defendants warrant that they have (and will have) "timely filed all federal, state, and local tax returns." (Agreement § 7.3(b).) Even if Defendants filed their taxes and/or obtained extensions by the date of Rowen's affidavit, as he states, that testimony does not demonstrate that the returns or extensions for 2011 and 2012 were "timely filed" as required by Section 7. Indeed, he testified in his June and December 2013 depositions that those returns had not yet been filed. (June Rowen Dep. at 52; Dec. Rowen Dep. at 308.) So far as we can tell, the record contains no information about extensions, including when they took effect, for how long, and whether Defendants informed the Mahers thereof. Accordingly, we find that Defendants violated Section 7.3.[23]

### b.   Claims of Default under Section 8.4

Under the next default provision, Section 8.4, Defendants' failure "to pay or perform any other obligation" constitutes a default if it "materially adversely affect[s] [Playroom]'s financial condition." (Agreement § 8.4.) In alleging this default, the Mahers point to the same obligations they cite with respect to Section 5.1, which we discussed earlier when evaluating possible defaults under Section 8.3. Although, as above, we find that Defendants' failure to make payments in accordance with the Triways Agreement constitutes a violation of Section 5.1(b), the Mahers have not articulated how this particular failing has a materially adverse effect on Playroom. For example, Triways has not entered judgment against Playroom, and the record

---

[23] In light of our holding, we need not address the Mahers' additional argument that this violation of Section 7.3 also violated Section 8.5.

does not show any financial penalty based on the failure to comply with the Triways Agreement. As such, we decline to find a default under Section 8.4.[24]

### c.    *Claims of Default under Section 8.7*

Section 8.7 of the Agreement lists several situations regarding Defendants' financial health that result in the automatic acceleration of the debt under Section 9.2.[25]  The Mahers argue that Defendants are in default under Section 8.7(d), which applies if either of Defendants is "adjudicated a bankrupt or insolvent," as well as under Section 8.7(g), which applies if Defendants are "not . . . paying its/his debts as they become due, unless such debt is being disputed and Lender has received written notice of such dispute."  (Agreement § 8.7; *see also* Pls.' MPSJ Mem. at 10.)

Section 8.7(d) is not properly invoked here, as a plain reading of this provision requires an adjudication.  Although the Mahers insist, perhaps rightfully, that Playroom is insolvent, and although Defendants do not effectively dispute this characterization, the fact remains that neither Defendant has been *adjudicated* insolvent.

With respect to Section 8.7(g), the Mahers point once again to the alleged unpaid debts they argue violate Section 5.1.  The failure to make payments under the Triways Agreement constitutes a violation of Section 5.1.  Although Rowen testified to a negotiated standstill with Triways, the record does not demonstrate that the Mahers have received written notice of the dispute or resolution with Triways.  Therefore, a default exists under Section 8.7(g).

---

[24] We also decline to address, as moot, Defendants' argument that the Mahers cannot claim default under Sections 8.3, 8.4, and 8.7 from the same conduct that violated Section 5.1.  (*See* Dkt. 222 (Defs.' MPSJ Resp.) at 12.)

[25] Under Section 9.1, defaults occurring under Sections 8.1 through 8.6 trigger *optional*, rather than *automatic*, acceleration.  (*Compare* Agreement § 9.1 *with id.* § 9.2.)

#### d.   Summary of Claims of Default, Entitlement to Acceleration, and Breach

Questions of material fact clearly persist as to some of the violations alleged by the Mahers. Nevertheless, as discussed in detail above, we conclude that Defendants violated Sections 5.1(b), 5.2(a), and 7.3, triggering default under the broadly-worded Section 8.3, as well as under Section 8.7(g).

The Agreement entitled the Mahers to accelerate the indebtedness as a result of these events of default.[26] The Mahers took appropriate steps to do so, by sending notices of default and acceleration to Defendants on August 20, 2012. (Pls.' SUMF ¶ 21; *see* Compl., Exs. F and G (8/20/12 Ltrs. from Pls.' Counsel to Playroom and Rowen, advising of defaults and declaring all indebtedness immediately due); *see also* Agreement § 9 (describing the Mahers' remedies upon default).) It is undisputed that Defendants have not paid the accelerated debt in full. (Pls.' SUMF ¶ 18; Rowen Aff. ¶ 27 (first two sentences only, third sentence stricken).)

For these reasons, we conclude that Defendants have breached the Agreement.[27] *See, e.g.*, *REI Transp. v. C.G. Robinson Worldwide, Inc.*, 519 F.3d 693, 698 (7th Cir. 2008) ("Non-payment is a material breach of a contract . . . .").

### 2.   The Mahers' Performance

Having satisfied the breach element for Count One, the Mahers must next prove that they have fully performed the contract, or that they have an excuse for any nonperformance. *See Fednav Int'l Ltd.*, 624 F.3d at 839; *Van Der Molen v. Wash. Mut. Fin., Inc.*, 359 Ill. App. 3d 813, 823, 835 N.E.2d 61, 69 (1st Dist. 2005). As the party seeking to enforce the Agreement, the

---

[26] Technically, Defendants' default under Section 8.7(g) triggered an automatic acceleration, which did not require notice from the Mahers to take effect. (Agreement § 9.2.)

[27] In their addendum, the Mahers also argued that Defendants' failure to make the quarterly payment due March 31, 2014 constitutes a breach of Section 8.1 of the Agreement. We need not address this argument, which is moot in light of this opinion.

Mahers "ha[ve] the burden of proving that [they have] substantially complied with all the material terms of the agreement."  *Goldstein v. Lustig*, 154 Ill. App. 3d 595, 599, 507 N.E.2d 164, 168 (1st Dist. 1987); *see Freight Train Adver., LLC v. Chi. Rail Link, LLC*, 11 C 2083, 2012 WL 5520400, at *5 (N.D. Ill. Nov. 14, 2012) (discussing the material breach doctrine under Illinois law).  Under the Agreement, the Mahers' primary obligation was to disburse the loan funds.  The Mahers disbursed $435,000, but argue that they were excused from funding the remaining $65,000 because the Agreement permitted them to cease making any advances upon the event of any "possible default."  (Agreement §§ 1.14, 8, 9.4; *see* Pls.' MPSJ Mem. at 13; Pls.' MPSJ  Reply at 11–12.)

Defendants assert that the Mahers had no excuse for failing to disburse the final $65,000.  (Defs.' MPSJ Resp. at 8–9.)  According to Defendants, Rowen requested the final sum, to no avail, in February and March of 2012—prior to the Mahers' April 6, 2012 informal notice of possible default and well before the official notices were sent on August 20, 2012.  (*See* Defs.' SAUMF ¶ 31; Rowen Aff. ¶ 31 & Exs. 8–9.)  The parties dispute when Rowen requested disbursement, but emails dated March 8, 2012 and April 5, 2012 include language that a jury could find to be such requests.  (*See* Rowen Aff., Ex. 8 (3/8/12 Rowen email indicating that the remaining $65,000 "would be helpful" to cover the cost of a particular shipment) & Ex. 9 (4/5/12 Rowen email expressly requesting funds).)  Defendants thus have raised questions of material fact as to the timing of Playroom's requests and the Mahers' performance thereafter.

In reply, the Mahers argue that a partial breach does not excuse a party's own obligation to perform.  (Pls.' MPSJ Reply at 1–4, 11.)  Under Illinois law, a party to a contract need not continue performance following the other party's total or material breach.  *U.S. ex rel. Pileco, Inc. v. Slurry Sys., Inc.*, 872 F. Supp. 2d 710, 718 (stating that "a material breach by one party to

a contract discharges the other from performing its obligations"); *Kel-Keef Enters. v. Quality Components Corp.*, 316 Ill. App. 3d 998, 1016–17, 738 N.E.2d 524, 537 (1st Dist. 2000); *see Anderson v. Long Grove Country Club Estates*, 111 Ill. App. 2d 127, 139, 249 N.E.2d 343, 349 (2d Dist. 1969) ("A material or total breach is a failure to do an important, substantial or material undertaking set forth in a contract.").  Presumably, the Mahers intend to argue that their own failure to pay constitutes a partial breach, calling attention to *Israel v. National Canada Corporation*, in which a lender's delay in loan advancements was merely a partial breach.  276 Ill. App. 3d 454, 460, 658 N.E.2d 1184, 1190 (1st Dist. 1979).  (*See* Pls.' MPSJ Reply at 1–4.)  In *Israel*, requested loan advancements were delayed by periods of time ranging between eleven and thirty-six days.  *Israel*, 276 Ill. App. 3d at 457, 658 N.E.2d at 1188.  By contrast, the final $65,000 that Defendants claim to have requested was never paid out at all.

We agree with the Mahers that a mere delay in funding could be a partial breach under *Israel*, but an outright denial of an advancement arguably rightfully requested is more likely to be material.  Here, it is unclear if and when Playroom requested funds and whether the Mahers were excused from payment based upon a possible default.  While the Mahers have proven breach, material questions of fact preclude summary determination on this second element.  The Mahers' motion for summary judgment as to Count One is therefore denied.

## D.     Defendants' Counterclaim Count Three: Breach of Contract

Plaintiffs relatedly seek summary judgment with regard to the third count of Defendants' Counterclaim, which alleges that the Mahers breached the Agreement.  To prevail, Defendants must demonstrate the aforementioned elements of a contract claim.  *Fednav Int'l Ltd.*, 624 F.3d at 839; *Reger Dev., LLC*, 592 F.3d at 764; *W.W. Vincent & Co*, 351 Ill. App. 3d at 759, 814

N.E.2d at 967.  There is no question as to the validity of the Agreement, and the damages

Defendants allege comprise the $65,000 in loan funds that were never advanced.

As with the Mahers' breach of contract claim, this intertwined counterclaim hinges on

whether, and to what degree, the parties performed or breached the contract.  Because of the

remaining questions of material fact with regard to the Mahers' performance of their obligations

under the Agreement, summary judgment is denied with respect to Defendants' Counterclaim

Count Three.

**E.      Plaintiffs' Count Two: Breach of Guaranty**

Plaintiffs also seek summary judgment on Count Two of their complaint, alleging that

Rowen breached the Guaranty.  "A guaranty is 'a third party's promise to answer for payment on

or fulfill an obligation if the [or entity] primarily liable fails to perform.'"  *Dynegy Mktg. &*

*Trade v. Multiut Corp.*, 648 F.3d 506, 519 (7th Cir. 2011) (quoting *Panno v. Nicolau*, 174 Ill.

App. 3d 890, 894–95, 529 N.E.2d 95, 98 (4th Dist. 1988)).  To succeed on this claim, the Mahers

must demonstrate the original indebtedness, the default of the debtor (here, Playroom), and the

existence of the Guaranty.  *Gen. Elec. Bus. Fin. Servs., Inc. v. Silverman*, 693 F. Supp. 2d 796,

799 (N.D. Ill. 2010); *Mid-City Indus. Supply Co. v. Horwitz*, 132 Ill. App. 3d 476, 483, 476

N.E.2d 1271, 1277 (1st Dist. 1985); *see also Lincoln Nat'l Life Ins. Co. v. TCF Nat'l Bank*, 10

C 6142, 2013 WL 3388865, at *3 (N.D. Ill. July 8, 2013); *FirstMerit Bank, NA v. Grasso*, 11

C 8986, 2012 WL 5200111, at *3 (N.D. Ill. Oct. 22, 2012).  The original indebtedness under the

Agreement and the validity of the Guaranty are not in question.

In the Guaranty, Rowen "personally, unconditionally, and absolutely" guaranteed to the

Mahers that, on a continuing basis, all payments would be made under the loan documents and

Playroom would perform all of its covenants and obligations.  (Guaranty § 1.)  The Guaranty

further provides that, in the event of a default under the Agreement, the Mahers have discretion to accelerate the debt and demand immediate payment of "the entire unpaid balance" and interest.[28]  (*Id.* § 6.)  We have held that Defendants defaulted under Sections 8.3 and 8.7(g).  It is further undisputed that the Mahers sought accelerated payment, which neither Playroom, nor Rowen, have satisfied.  (*See* Compl., Ex. G (8/20/12 Ltr. from Pls.' Counsel to Rowen, advising of default and declaring all indebtedness immediately due under Guaranty).)  Because Rowen has not paid the accelerated debt as required under the Guaranty, we grant summary judgment in favor of the Mahers with respect to Plaintiffs' Count Two.[29]  *See, e.g.*, *Grunstad v. Ritt*, 166 F.3d 867, 872 (7th Cir. 1999) ("Illinois suretyship law is clear: an absolute guarantor is liable immediately upon default of the principal . . . ."); *FirstMerit Bank, NA*, 2012 WL 5200111, at *3.

## F.    Defendants' Counterclaim Count Four: Tortious Interference with the EDA

Plaintiffs seek summary judgment in their favor on Defendants' claim of tortious interference with contractual relations.  To succeed, Defendants would be required to show: (1) a valid contract between Playroom and ACD; (2) the Mahers' awareness of the contract; (3) the Mahers' intentional or unjustifiable inducement to a breach; (4) a subsequent breach caused by that inducement; and (5) resulting damages.  *Burrell v. City of Mattoon*, 378 F.3d 642, 652 (7th

---

[28] Rowen also expressly waived "[a]ll suretyship and guarantors' defenses generally" in the Guaranty.  (*Id.* § 3(l); *see also id.* § 3(j) (waiving right to reimbursement from Playroom should he be required to make payments on its behalf).)

[29] Defendants claim that the Mahers' failure to disburse the final $65,000 raises a question of fact about Rowen's liability under the Guaranty.  (Defs.' MPSJ Resp. at 13.)  Defendants overlook the fact that a plaintiff's performance is not an element of a breach of guaranty claim, as it is for a breach of contract claim.  Relatedly, an action to enforce a guaranty action is separate from any other action to collect on the related debt.  *See, e.g.*, *Chrysler Credit Corp. v. Marino*, 63 F.3d 574, 577–79 (7th Cir. 1995) (stating that a breach of guaranty action involved different claims from those raised in a replevin action against the borrower-dealership because the parties "intentionally structured the guaranty independently" of the other loan documents); *SFT 1, Inc. v. Leo*, 09 C 2269, 2011 WL 3756370, at *4 (N.D. Ill. Aug. 23, 2011) (reiterating that a guaranty can be enforced apart from other pending litigation on the underlying loan).  Defendants also gloss over the explicitly absolute and unconditional nature of the Guaranty.

Cir. 2004); *Clarage v. Kuzma*, 342 Ill. App. 3d 573, 582–83, 795 N.E.2d 348, 357 (3d Dist. 2003).  There is no question that the EDA existed between Playroom and ACD, or that the Mahers were aware of the contract.  (*See* Dkt. 29-1, Exs. 7–8 (EDA & Amendment to EDA).) Indeed, the enactment of the EDA was a condition precedent to the Agreement.  (*See* Agreement § 2.2.)  The Mahers deny, however, that they induced ACD to any breach of the EDA.

In briefing, the Defendants neither expressly accuse ACD of breaching the EDA, nor articulate precisely how the Mahers induced ACD to do so.  In the amended counterclaim, Defendants assert that ACD breached its promise to use its "commercially reasonable efforts to sell, promote, distribute and otherwise exploit" Playroom products.  (EDA § 4.1.)  Rowen relates that—since April 2012, around when the Mahers' withheld the final payment—ACD has not actively promoted Playroom products by, *inter alia*, failing to include them in customer emails, monthly magazines, social media, and trade shows.  (Rowen Aff. ¶¶ 77, 79–80.)  Rowen further states, based on his conversations with retailers, that ACD sales representatives are not pushing Playroom products to their customers.  (*Id.* ¶ 77.)  By way of further example, Rowen reports that ACD has refused to provide marketing support and has used either outdated information or misinformation in ads.[30]  (*Id.* ¶¶ 77, 79–84.)  Rowen testifies that Playroom's sales after entering the EDA "are far below what they had been prior to" it.  (*Id.* ¶ 84.)  The Mahers agree with Defendants that Playroom's sales have decreased since execution of the EDA but insist that they have done nothing to cause that decline.

A tortious interference claim is inherently difficult to prove, as plaintiffs must typically rely on circumstantial evidence to show inducement by the alleged tortfeasors.  *See Pampered Chef v. Alexanian*, 804 F. Supp. 2d 765, 802–03 (N.D. Ill. 2011) (explaining that circumstantial

---

[30] Neither party addresses in depth whether ACD actually breached Section 4.1 the EDA through this conduct.  We will assume for present purposes, like the parties, that breach occurred.

evidence taken as a whole can be convincing to show inducement, rather than mere coincidence, in a tortious interference case); *Meza v. Serv. Merch. Co., Inc.*, 951 S.W.2d 149, 152 (Tex. App. 1997) (noting that defendants are unlikely to admit guilt or outright acknowledge inducement in such cases); *see also Tristar Investors, Inc. v. Am. Tower Corp.*, 12 C 499, 2014 WL 1327663, at *20 (N.D. Tex. Apr. 3, 2014); *DW Data, Inc. v. Coakley Relocation Sys., Inc.*, 951 F. Supp. 2d 1037, 1054 (N.D. Ill. 2013) (noting the validity of circumstantial evidence where a conclusion requires reasonable inference). Here, Defendants provide only scanty circumstantial evidence. Defendants emphasize the Mahers' roles as Bob Jr.'s parents and their involvement with ACD. It is undisputed that Marilyn is the CFO of ACD, and that Robert offers business advice to Bob Jr. about ACD. (*See* Pls.' SUMF ¶ 33; Defs.' SAUMF ¶ 40.) Defendants argue that the Mahers' positions of power within ACD gave them the ability to interfere with the EDA.

Additionally, Defendants claim that the Mahers intentionally interfered with the EDA as part of a plan to take control of Playroom. In support, Defendants point out that the Mahers filed two unsuccessful petitions for receivership in this litigation and that Robert previously requested that Rowen turn over Playroom via a UCC sale, even after Rowen had offered other resolutions. (Rowen Aff. ¶¶ 40–41.) Defendants contend that the Mahers' desire to take over Playroom provided incentive for their interference with the EDA.

Because Defendants are the non-movants, we draw all reasonable inferences in their favor. *Anderson*, 477 U.S. at 255, 106 S. Ct. at 2513. Nonetheless, we find that no reasonable trier of fact could infer, from the facts before us, that the Mahers intentionally, unjustifiably induced ACD and/or Bob Jr. to breach the EDA. *See Sarver*, 390 F.3d at 970. Defendants have proven that the Mahers had the ability to influence Bob Jr. But Defendants failed to offer any facts from which a jury could properly infer that the Mahers specifically, affirmatively induced

ACD to shirk its obligations.  Defendants do not identify any event, conversation, or other factual scenario that suggests *how* the Mahers interfered with the EDA.

Nor are we persuaded by Defendants' theory of *why* the Mahers would seek to interfere with the EDA.  Defendants' generalized belief that the Mahers seek to take over Playroom does not support an inference that the Mahers took any action to unlawfully cause their son to breach the EDA.  *See, e.g.*, *Rhino Linings USA, Inc. v. Harriman*, 658 F. Supp. 2d 892, 904–05 (S.D. Ind. 2009) (finding that the defendant's "interest in acquiring" the complainant's dealerships was "not sufficient, by itself, to support a claim" of tortious interference).  Indeed, this hypothesis seems contradictory to the argument (fundamental to an allegation of tortious interference) that the Mahers have acted intentionally to harm Playroom's business.  It is illogical that the Mahers would encourage breach of the EDA to sabotage Playroom's sales, in the hopes of ultimately acquiring a devalued business.

In sum, the record evidence does not support a reasonable inference that the Mahers intentionally induced ACD's alleged breach of the EDA with Playroom.  We therefore grant summary judgment in favor of the Mahers on Count Four of Defendants' Counterclaim.

## CONCLUSION

For the reasons discussed above in Part One, the preliminary motions surrounding the MPSJ are resolved as follows.  Defendants' motion to amend (Dkt. 267) is granted.  The motion to strike Robert's affidavit (Dkt. 223) is granted in part and denied in part.  The motion to strike Robert's addendum affidavit and additional addendum materials (Dkt. 225) is denied.  The motion to strike Rowen's affidavit (Dkt. 245) is granted in part and denied in part.  The motion to strike Rebekah Zetty's affidavit (Dkt. 246) is denied.  The motion to strike Defendants' response to the SUMF (Dkt. 243) is denied.  The motion to strike Defendants' SAUMF

(Dkt. 244) is denied.  The motion to strike facts and arguments from Plaintiffs' response materials (Dkt. 265) is denied.  The motion to strike Defendants' response to the addendum (Dkt. 286) is granted.

In addition, we grant the Mahers' MPSJ in part and enter summary judgment in favor of Plaintiffs with respect to Plaintiffs' Count Two, and Count Four of Defendants' Counterclaim. We deny the MPSJ with respect to Plaintiffs' Count One, and Count Three of Defendants' Counterclaim.  Plaintiffs' Counts One, Three, Four, and Five, as well as Defendants' Count Three, remain pending for trial.  It is so ordered.


_____
Marvin E. Aspen
United States District Judge



Dated: January 20, 2015
         Chicago, Illinois