**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| ROBERT P. MAHER and | ) | |
| MARILYN V. MAHER, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | No. 12 C 7169 |
| | ) | Honorable Marvin E. Aspen |
| THE ROWEN GROUP, INC., d/b/a | ) | |
| PLAYROOM ENTERTAINMENT, | ) | |
| and DANIEL M.J. ROWEN, | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

MARVIN E. ASPEN, District Judge:

On September 7, 2012, Plaintiffs Robert and Marilyn Maher ("Plaintiffs" or "the

Mahers") brought suit against The Rowen Group, Inc., d/b/a Playroom Entertainment

("Playroom") and its president and founder, Daniel M.J. Rowen ("Rowen"), alleging numerous

claims arising out of a loan made from the Mahers to Playroom. Rowen had acted as guarantor

for the loan. Playroom and Rowen subsequently filed counterclaims against the Mahers, alleging

that the Mahers had breached the loan agreements themselves and had committed tortious

interference with another contract.[1] Plaintiffs filed a motion for partial summary judgment as to

their claims for breach of contract (Count One) and for breach of guaranty (Count Two).

Plaintiffs also sought summary judgment in their favor on Defendants' counterclaims.

(Dkt. No. 179.)

---

[1] Rowen and Playroom further levied allegations of fraud and conspiracy to restrain trade. In
April 2013 we dismissed these claims as barred by the Illinois Credit Agreement Act and failing
to state a claim under the Sherman Act, respectively. *Maher v. Rowen Grp., Inc.*, 12 C 7169,
2013 WL 1729483 (N.D. Ill. Apr. 22, 2013) (Dkt. 87).

By opinion dated January 20, 2015 ("Opinion"), we denied Plaintiffs' motion with respect to the intertwined breach of contract claim and counterclaim. (Dkt. No. 299.) We found that Defendants had breached three particular sections of the loan agreement executed June 30, 2011 ("Agreement"), triggering default. (Op. at 28–38.) Due to these breaches, the Agreement entitled the Mahers to accelerate the indebtedness. (*Id.* at 38.) We further found that the Mahers demanded payment on August 20, 2012 and that Defendants had not satisfied their obligations to pay the accelerated debt in full. (*Id.*) We denied summary judgment, however, because we found that Defendants raised a genuine question of material fact about whether the Mahers adequately performed their duties under the Agreement. (*Id.* at 38–40.) By April 6, 2012, the Mahers had refused to disburse the final $65,000 under Agreement, and the parties dispute whether that refusal was justified. (*Id.*) Due to open questions surrounding whether the Mahers "substantially complied with all the material terms of the [Agreement]," as necessary for them to prevail on a breach of contract claim, we denied Plaintiffs' motion both as to their breach of contract claim and as to Defendants' breach of contract counterclaim. (Op. at 40–41 (quoting *Goldstein v. Lustig*, 154 Ill. App. 3d 595, 599, 507 N.E.2d 164, 168 (1st Dist. 1987).)

In the Opinion, we also granted Plaintiffs' motion in part. We found Rowen liable for breach of guaranty and dismissed Defendants' counterclaim against Plaintiffs for tortious interference. (Op. at 41–45.) We concluded that, like the Agreement, the unconditional guaranty ("Guaranty") signed by Rowen on June 30, 2011 authorized the Mahers to accelerate the debt and demand immediate payment of any unpaid balance in light of Defendants' breaches under the Agreement. (Op. at 41–42.) Because it is undisputed that Rowen had not paid the accelerated debt, and because the Mahers' performance was not relevant to the claim for breach

of guaranty, we granted summary judgment against Rowen on Count Two. (Op. at 41–42 & nn. 28–29.)

On January 26, 2015, Plaintiffs filed two motions. First, Plaintiffs ask that we reconsider our denial of their motion on the breach of contract claims. (Dkt. No. 300.) Second, Plaintiffs ask that we enter final judgment against Rowen on Count Two under Rule 54(b).[2] (Dkt. No. 302.) For their part, Defendants filed a motion on January 27, 2015, seeking reconsideration of our ruling in Plaintiffs' favor on Count Two. (Dkt. No. 304.) For the reasons set forth below, we deny all three motions.

## STANDARD OF REVIEW

Because the parties have asked us to reconsider a non-final order, our analysis is guided by Federal Rule of Civil Procedure 54(b), as well as our inherent authority. *See Bank of Waunakee v. Rochester Cheese Sales, Inc.*, 906 F.2d 1185, 1191 (7th Cir. 1990); *Caine v. Burge*, 897 F. Supp. 2d 714, 716 (N.D. Ill. 2012); *Mitchell v. JCG Indus.*, 845 F. Supp. 2d 1080, 1082–83 (N.D. Ill. 2012); *see also Moses H. Cone Mem. Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 12, 103 S. Ct. 927, 935 (1983) (noting that "every order short of a final decree is subject to reopening at the discretion of the district judge"). Rule 54(b) provides that a non-final order "may be revised at any time before the entry of a judgment adjudicating all the claims and all the parties' rights and liabilities." Fed. R. Civ. P. 54(b). Reconsideration is appropriate only "where a court has misunderstood a party, where the court has made a decision outside the adversarial issues presented to the court by the parties, where the court has made an error of apprehension (not of reasoning), where a significant change in the law has occurred, or where significant new

---

[2] Plaintiffs also filed a motion to strike Defendants' jury demand, which was granted by Magistrate Judge Brown on referral, without objection from Defendants. (*See* Dkt. Nos. 301, 314–15.)

facts have been discovered." *Broaddus v. Shields*, 665 F.3d 846, 860 (7th Cir. 2011), *overruled on other grounds by Hill v. Tangherini*, 724 F.3d 965, 967 n.1 (7th Cir. 2013); *see also Bank of Waunakee*, 906 F.2d at 1191; *Caine*, 897 F. Supp. 2d at 716.

"[A] motion for reconsideration does not allow a party to revisit strategic decisions that prove to be improvident, to reargue the evidence, to make new arguments, or to introduce new evidence that could have been presented earlier." *HCP of Ill., Inc. v. Farbman Group I, Inc.*, 991 F. Supp. 2d 999, 1000 (N.D. Ill. 2013); *Caine*, 897 F. Supp. 2d at 717; *see Janusz v. City of Chi.*, 03 C 4402, 2015 WL 269934, at *4 (N.D. Ill. Jan. 20, 2015). Rule 54 motions thus serve a limited function and are granted only in exceptional circumstances. *Bank of Waunakee*, 906 F.2d at 1191; *HCP of Ill., Inc.*, 991 F. Supp. 2d at 1000; *Caine*, 897 F. Supp. 2d at 717; *see Patrick v. City of Chi.*, 14 C 3658, 2015 WL 1880389, at *2 (N.D. Ill. Apr. 23, 2015).

### ANALYSIS

We begin with Plaintiffs' motion for reconsideration of our conclusions as to the breach of contract claims. We then address the remaining motions related to our holding for Plaintiffs on their breach of guaranty claim.

## I.    Reconsideration as to the Breach of Contract Claim and Counterclaim

In Illinois, a successful breach of contract claim requires proof of the existence of a valid contract, the plaintiff's substantial performance of the contract, the defendant's breach of the contract, and damages. *Fednav Int'l Ltd. v. Cont'l Ins. Co.*, 624 F.3d 834, 839 (7th Cir. 2010); *Reger Dev., LLC v. Nat'l City Bank*, 592 F.3d 759, 764 (7th Cir. 2010); *W.W. Vincent & Co. v. First Colony Life Ins. Co.*, 351 Ill. App. 3d 752, 759, 814 N.E.2d 960, 967 (1st Dist. 2004); *see RTP LLC v. ORIX Real Estate Capital, Inc.*, 13 C 350, 2014 WL 4414512, at *5 (N.D. Ill. Sept. 8, 2014). As set forth in detail in the Opinion, we found that three of the four elements of

Plaintiffs' contract claim were satisfied. The parties did not dispute the existence or validity of the Agreement. We concluded that Defendants breached the contract by violating Sections 5.1(b), 5.2(a), and 7.3, triggering default under Section 8.3, as well as under Section 8.7(g). (Op. at 32–33, 35–36, 37–38.) We further held that damages plainly stemmed from Defendants' breach of the Agreement because they have not repaid the accelerated debt in full. (*Id.* at 29, 38.)

We denied summary judgment for Plaintiffs, however, because of open fact questions about whether the Mahers' substantially performed their obligations under the Agreement. (*Id.* at 38–40.) The Mahers' primary obligation was to disburse the loan funds. The Mahers disbursed $435,000, but argued that they were excused from funding the remaining $65,000 because the Agreement permitted them to cease making any advances upon the event of any "Event of Default" or "Possible Default." (Agreement §§ 1.14, 8, 9.4; *see* Pls.' MPSJ Mem. at 13; Pls.' MPSJ Reply at 11–12.) The Mahers pointed out that they notified Rowen of the existence of the Possible Default situation by email dated April 6, 2012.[3] (Pls.' MPSJ Mem. at 13; *see also* 4/6/12 Maher email to Rowen (Dkt. No. 180-2).)

In evaluating that argument we focused, as did the parties, on whether Defendants' acts of default occurred before or after the Mahers' refusal to advance the final $65,000 payment. (*See* Op. at 39–40.) The parties disputed when Rowen requested the disbursement in early 2012, and the record is not clear on that point. (*Id.* at 39.) Rowen testified that he requested that final sum in February or March of 2012—well before the April 6, 2012 email warning of Possible Default. (*Id.*) Additionally, emails from Rowen dated March 8, 2012 and April 5, 2012 include

---

[3] That email identified Possible Defaults under Sections 5.1(b), 5.2(a), 5.2(d), and 8.7(g), which, generally speaking, address the payment of debts as they become due and the maintenance of financial records.

language that a trier of fact could deem as requests by Rowen for the disbursement. (*Id.*) We thus concluded that Defendants had raised questions of material fact about the timing of Playroom's request and whether the Mahers had the authority under the Agreement to refuse to make further advances to Defendants at that time. (*Id.* at 39–40.)

In the present motion, Plaintiffs argue that we misapprehended the terms and relevance of Section 9.4 of the Agreement, which governs their rights in the event of default. (Mot. to Alter ¶¶ 5–9; *see also* Reply ISO Mot. to Alter at 2–7.) They contend that because we found that Defendants committed two particular defaults prior to February 2012, we must also conclude axiomatically that the Mahers had no contractual duty under Section 9.4 to advance further funds. (Mot. to Alter ¶¶ 5–8.) Having reviewed the original summary judgment submissions along with the pending motion, and as discussed below, we perceive no misapprehension or manifest error of law or fact.

### A. Violation of Section 5.2(a)—Failure to Comply with GAAP

Before addressing Plaintiffs' first argument, we review the pertinent background. In the Agreement, Playroom entered into an affirmative covenant whereby it promised to "[use] its best efforts to keep true and complete financial records" and to "keep such records in accordance with GAAP"[4] on or by October 31, 2011. (Agreement § 5.2(a).) It is undisputed that Defendants attempted to update their accounting practices but that they failed to become GAAP-compliant by the October 31, 2011 deadline. (Op. at 21–22.) We noted in the Opinion that the parties dispute whether Playroom ever achieved GAAP-compliance, or when. (*Id.* at 33.) Nonetheless,

---

[4] "GAAP" refers to Generally Accepted Accounting Principles. As discussed in the Opinion, we rejected the proferred expert testimony of Robert Maher concerning a litany of alleged errors in Playroom's financial records. (Op. at 4–6.)

we found that Defendants admittedly violated Section 5.2(a) by failing to meet the contractual deadline.  (*Id.*)

Plaintiffs contend that, in light of this default, Section 9.4 of the Agreement entitled them to withhold future advances.  Section 9.4 of the Agreement provides that "[u]pon the occurrence of any Possible Default, [the Mahers] may immediately cease making Advances on the Loan *while any Possible Default exists*."  (Agreement § 9.4 (emphasis added).)  "Possible Default" is defined as "an event, condition, or thing which, with the lapse of any applicable grace period or the giving of notice, or both, would constitute an Event of Default."  (*Id.* § 1.14.)  Section 9.4 further provides that "[u]pon the occurrence of any Event of Default, [the Mahers] shall thereafter have no obligation under any circumstances to make any further Advances."  (*Id.* § 9.4.)  "Events of Default" are defined in and governed by Section 8 of the Agreement.  Under Section 8.3, the violation of an affirmative covenant, as set forth in Section 5, becomes an Event of Default if the failure is not "fully corrected to [the Mahers'] complete satisfaction within 15 days . . . after [the Mahers have] given written notice thereof" to Defendants.  (*Id.* § 8.3.)

Despite superficial appeal, Plaintiffs' arguments about Possible Default or Event of Default do not warrant reconsideration due to lingering fact questions.  First, we consider whether the failure to meet the October 31, 2011 deadline constitutes a Possible Default under Sections 1.14 and 9.4.  The fact that Defendants were not GAAP-compliant on October 31, 2011 does not mean that they failed to cure that violation by the time the Mahers rejected Rowen's request for the funds, whenever those subsequent events took place.  We explicitly stated that the record did not show "whether Playroom ever achieved GAAP compliance" and that we could not "resolve the Mahers' specific allegations of GAAP violations."  (Op. at 33.)  Some evidence suggested that Playroom might have accomplished that goal by December 2011, for example, at

which time it began using a new accounting system. (*Id.*; *see also id.* at 21–22.) But Defendants' concession that they missed the October 31, 2011 deadline is not also a concession that the problems continued unabated through Rowen's request for funds in early 2012. Because it is not clear if, or when, that Possible Default terminated, (i.e., if Defendants satisfied GAAP), we cannot find at this stage that a Possible Default occurred and continued through the relevant, but unknown, timeframe. In other words, given the factual disputes about GAAP compliance *after* the October 31, 2011 deadline, the Mahers cannot rely on the deadline violation to show the existence of a Possible Default in early 2012 under Sections 5.2(a) and 8. This timing matters because Section 9.4 authorizes the Mahers to withhold funds only "while any Possible Default exists." If the Possible Default dissipated prior to Defendants' request for funds, so did the Mahers' justification under Section 9.4. Thus, as we indicated in the Opinion, more evidence is necessary.

Relatedly, the Mahers argue that it is not their job to provide additional evidence of an ongoing GAAP violation. The Mahers contend that Defendants must come forth with evidence to show their satisfaction of Section 5.2(a) at the relevant time period. (Reply ISO Mot. to Alter at 6.) We disagree. To prevail on their breach of contract claim, in which they attempt to enforce the Agreement against Defendants, the Mahers must demonstrate their own substantial performance.[5] *See Fednav Int'l Ltd.*, 624 F.3d at 839; *Reger Dev., LLC*, 592 F.3d at 764. The Mahers admit that they did not fund the final $65,000 under the loan, and it is their burden to show that this lack of performance was justified. Accordingly, the Mahers—not Defendants— must show the existence of a Possible Default or Event of Default at the pertinent time, which

---

[5] Defendants, of course, bear the same burden of proof with respect to their breach of contract counterclaim.

would theoretically excuse the withholding of the final payment and establish their performance of their obligations under the Agreement.

Second, we consider the alternate argument that Defendants' failure to abide by GAAP by October 31, 2011 represents an Event of Default. We deny the motion because, under the plain terms of Section 8.3, this failure does not constitute an Event of Default until the Mahers have provided written notice and allowed 15 days for Defendants to cure the violation. (Agreement § 8.3.) The Mahers provided notice (though arguably informal notice) of Possible Default by email on April 6, 2012 and formal notice of default and acceleration by letter from counsel dated August 20, 2012. (*Id.* at 23–24.) Assuming that Defendants were not GAAP-compliant as of April 6, 2012, and assuming the email constitutes sufficient notice under Section 8.3,[6] the failure to comply with GAAP would not become an Event of Default until 15 days thereafter. At that point, the Mahers would have grounds under Section 9.4 to cease all further disbursements in light of the Event of Default. (Agreement § 9.4.) But again, because the record does not clarify when Defendants requested the final advance or when the Mahers rejected it, we cannot conclude that the Mahers properly denied the advance under the Agreement.

In sum, our finding that Defendants did not meet the October 31, 2011 deadline set by Section 5.2(a) does not require the further legal conclusions asserted by Plaintiffs as to the

---

[6] The parties do not raise the issue, but we question whether Robert's April 6, 2012 email constitutes "notice" to the extent required by Section 10 of the Agreement. Section 10 provides that "all notices . . . and other communications hereunder . . . shall be deemed to have been given if in writing and (1) personally delivered against a written receipt, or (2) sent by confirmed telephonic facsimile, or (3) delivered to a reputable express messenger service . . . for overnight delivery." (Agreement § 10.1.) It is unclear whether any email, or this particular email, could be considered "personally delivered against a written receipt" and thus qualify as a "written notice" in satisfaction of Section 8.3.

existence of either a Possible Default or an Event of Default.  As a result, their motion for reconsideration is denied.

## B.  Violation of Section 7.3(b)—Failure to Timely File Tax Returns

In the Agreement, Defendants also represented and warranted, on a continuing basis, that they were not "in default in the payment of any tax" and that they "have timely filed all federal, state, and local tax returns and have paid all taxes required to be paid therewith."  (Agreement § 7.3(b).)  As mentioned in the Opinion, Defendants did not file their tax returns for 2008, 2009, or 2010 until December 2011, six months after executing the Agreement.  (Op. at 24; *see also id.* at 31.)  Defendants incurred a related penalty of $10,503.  (Op. at 31.)  In addition, Defendants admittedly had not filed their 2011 and 2012 tax returns as of December 2013. (Op. at 35–36.)  Plaintiffs contend that these undisputed facts entitle them to judgment, and we address their specific arguments below.

### 1.  Timeliness of Plaintiffs' Argument Concerning 2008–2010 Returns

In their motion, Plaintiffs contend—for the first time—that the 2008–2010 late filings constitute an Event of Default.  At the summary judgment stage, Plaintiffs argued that the penalty incurred with the late-filed 2008–2010 tax returns constituted a debt that Defendants failed to pay in accordance with Section 5.1 of the Agreement.[7]  Plaintiffs did not separately argue, however, that the late filings themselves violated Section 7.3(b).  (*See* Pls.' MPSJ Mem. at 6; *see also* Pls.' MPSJ Reply at 9–10.)  At that stage, Plaintiffs raised an argument under Section 7.3(b) with respect to the 2011 and 2012 taxes only.  (Pls.' MPSJ Mem. at 8–9.) Consistent with Plaintiffs' arguments, we found in the Opinion that the 2008–2010 returns were

---

[7] Due to open questions, we declined to address the merits of that argument in the Opinion. (Op. at 31 (stating that we would not resolve the issue because the parties had not articulated when the penalty arose or whether it was "due" at the time the parties signed the Agreement).)

10

untimely, but we did not address whether that conduct constituted an Event of Default under

Section 7.3(b).  (Op. at 24, 31.)  Plaintiffs may not use a motion for reconsideration to reframe

their arguments, which could have been raised earlier.  *See Broaddus*, 665 F.3d at 860; *Bank of*

*Waunakee*, 906 F.2d at 1191.  Because we neither misunderstood nor misapprehended the

parties' arguments, Plaintiffs are not entitled to relief on this basis.

### 2.    Merits of Plaintiffs' Argument Concerning 2008–2010 Returns

As the present motion raises a question of law, however, we elect to further evaluate

Plaintiffs' position.  Plaintiffs assert that Defendants violated Section 7.3 when they executed the

Agreement, because Defendants in fact had not "timely filed all federal, state, and local tax

returns" and had not disclosed that status in Schedule I attached to the Agreement.  (Agreement

§ 7.3(b) & Schedule I.)  According to Plaintiffs, this violation of Section 7.3(b) triggered

Section 8.5, which renders it an Event of Default to make any representation or warranty that is

"false or misleading in any material respect."  (*Id.* § 8.5; Mot. to Alter ¶ 7; Reply ISO Mot. to

Alter at 3–4.)

According to Defendants, however, the violation of Section 7.3(b) as to the 2008–2010

tax years cannot constitute an Event of Default unless the failure to disclose is materially false or

misleading.[8]  (Defs.' Resp. ¶¶ 13–14.)  Defendants contend that Plaintiffs have not demonstrated

how the alleged misrepresentation was material.  They argue, moreover, that Plaintiffs cannot do

so because Plaintiffs knew about the tax situation at the time they entered into the Agreement.

(*Id.*)  It is undisputed that Robert visited Rowen at Playroom's offices in California for two or

three days in April 2011 to discuss the specifics of the potential loan to Playroom.  (Rowen Aff.

---

[8] Defendants also argue that the notice requirement found in Section 8.3 applies equally to
alleged violations of Section 7.3, such that no Event of Default arises until after notice and an
opportunity to cure.  (Defs.' Resp. ¶ 13.)  Although the language of Section 8.3 might support
such a conclusion, we need not reach that question today.

(Dkt. No. 221-1) ¶ 16; Maher Aff. (Dkt. No. 248-1) ¶ 3; *see also* Defs.' SAUMF ¶ 4.)  Rowen

testified that, during that meeting, he provided Robert "with full and complete access to all of

Playroom's available financial information" so that Robert could determine whether to proceed

with the loan.[9]  (Rowen Aff. ¶ 16; *see also* Defs.' SAUMF ¶ 4.)  Based on this evidence,

Defendants contend that the alleged misrepresentation about the filing of the 2008–2010 tax

returns could not have been "false . . . in any material respect," within the meaning of

Section 8.5, because the Mahers decided to proceed with the loan after conducting their due

diligence.  (Defs.' Resp. ¶¶ 13–14.)

Our evaluation of Plaintiffs' theory hinges on our interpretation of Section 8.5.  On the

facts present here, resolution of Plaintiffs' argument turns on whether we consider the phrase "in

any material respect" within Section 8.5 to modify the term "false or misleading" or to modify

*only* the term "misleading."  When construing a contract under Illinois law, we examine the

agreement as a whole, according to its plain, ordinary, and prevalent meaning.  *Bourke v. Dunn*

*& Bradstreet Corp.*, 159 F.3d 1032, 1038 (7th Cir. 1998); *see also Wooley v. Jackson Hewitt,*

*Inc.*, 540 F. Supp. 2d 964, 979 (N.D. Ill. 2008).  Moreover, we give effect to all of the

contractual terms, harmonizing them and rendering them internally consistent to the extent

possible.  *LaSalle Nat'l Trust v. ECM Motor Co.*, 76 F.3d 140, 144–45 (7th Cir. 1996); *AGT*

*Crunch Chi., LLC v. 939 N. Ave. Collection, LLC*, 07 C 2986, 2008 WL 753951, at *3 (N.D. Ill.

Mar. 18, 2008).  (*See also* Agreement § 13.13 (memorializing the parties' agreement to this same

principle of contract interpretation).)

---

[9] The Mahers disputed this statement, in part, claiming that Robert reviewed only "the
documents prepared and presented by Mr. Rowen."  (Maher Aff. ¶ 3; *see also* Pls. Resp. to
Defs.' SAUMF ¶ 4.)  At the summary judgment stage—which, as a practical matter, is the
current posture for this narrow discussion—we draw all reasonable inferences in favor of the
non-moving party, here, Defendants.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255,
106 S. Ct. 2505, 2513 (1986).

Following Illinois courts' "four corners" rule for contract interpretation, the threshold inquiry is whether the contract is ambiguous. *See Bourke*, 159 F.3d at 1036; *Ford v. Dovenmuehle Mortgage Inc.*, 273 Ill. App. 3d 240, 245, 651 N.E.2d 751, 754 (1st Dist. 1995); *see also Kelly v. McGraw-Hill Cos., Inc.*, 885 F. Supp. 2d 885, 890 (N.D. Ill. 2012); *Hillenbrand v. Meyer Med. Group, S.C.*, 288 Ill. App. 3d 871, 876, 682 N.E.2d 101, 104 (1st Dist. 1997). "An instrument is ambiguous only if the language used is reasonably or fairly susceptible to having more than one meaning," even when considering the disputed language in the context of the entire agreement. *Bourke*, 159 F.3d at 1038 (quoting *Flora Bank & Trust v. Czyzewski*, 222 Ill. App. 3d 382, 388, 583 N.E.2d 720, 725 (5th Dist. 1991)). A "contract is not rendered ambiguous simply because the parties do not agree on the meaning of its terms." *Id.* If we find a contract ambiguous as to the parties' intent, "the interpretation of the language is a question of fact which a . . . court cannot properly determine" by dispositive motion. *Quake Constr., Inc. v. Am. Airlines, Inc.*, 141 Ill.2d 281, 288–89, 565 N.E. 990, 994 (Ill. 1990); *Gassner v. Raynor Mfg. Co.*, 409 Ill. App. 3d 995, 1008, 948 N.E. 2d 315, 328 (2d Dist. 2011) (allowing parol evidence, and precluding summary judgment, only if "the disputed language is ambiguous"); *Dawson v. Gen'l Motors Corp.*, 977 F.2d 369, 373 (7th Cir. 1992). On the other hand, our interpretation of an unambiguous contract is a question of law. *Bourke*, 159 F.3d at 1036; *Facility Wizard Software, Inc. v. SE Tech. Servs*., 647 F. Supp. 2d 938, 946 (N.D. Ill. 2009); *see First Ins. Funding Corp. v. Fed. Ins. Co.*, 284 F.3d 799, 804 (7th Cir. 2002).

We turn then to Section 8.5, which provides that an Event of Default arises:

If any representation or warranty or other statement of fact contained herein . . . at any time furnished by or for [Defendants] pursuant to or in connection with this Agreement . . . shall be false or misleading in any material respect or shall omit to state a material fact required to be stated therein, in light of the circumstances under which made, not misleading, on the date of which made, whether or not made with knowledge of same.

(Agreement § 8.5.)  Here, Defendants represented in Section 7.3(b) that they had timely filed all tax returns and would continue to do so.  (*Id.* § 7.3.)  Defendants did not disclose in Schedule I that their 2008–2010 returns were already late.  Accordingly, the representation of Section 7.3(b) was false at the time it was made on June 30, 2011.  Plaintiffs assert that the analysis ends here and that they have proven the Event of Default under Section 8.5 due to the falsity of the representation.  Defendants argue, however, that the clause "in any material respect" requires Plaintiffs to offer additional proof.

We agree with Defendants and, in doing so, we focus on the parties' use of the word "shall" in Section 8.5.  Section 8.5 prohibits representations that "shall be false or misleading in any material respect," as well as those that "shall omit to state a material fact required to be stated therein" to ensure that the statement is not misleading.  It is critical, in our view, that Section 8.5 does not prohibit representations that "shall be false" separately from those that "shall be misleading in any material respect" and those that "shall omit to state a material fact."  That is, we find that Section 8.5 unambiguously treats two types of misrepresentations—but not three—as Events of Default.  In addition, there is no comma between "false" and "or misleading in any material respect," which would distinguish them conceptually.  We also take into account that, when addressing omissions, Section 8.5 does not prohibit omissions unless they hide "a material fact."  The use of the word "material" elsewhere in Section 8.5 supports our conclusion that materiality is essential when construing alleged false or misleading statements. (Agreement § 8.5.)

Based on the plain language of Section 8.5, we hold as a matter of law that Plaintiffs must show that Defendants' representation in Section 7.3 was "false . . . in any material respect." (Agreement § 8.5.)  This conclusion opens the door for Defendants to argue, as they have, that

the falsity of the representation was inconsequential in this case because it did not affect Plaintiffs' decision to lend money to Playroom. Rowen testified that he fully disclosed Playroom's financial records to Robert prior to execution of the Agreement, and we can reasonably infer from the facts that such disclosure during their multi-day meeting included Playroom's tax history. In light of Rowen's testimony, we find that Defendants have raised a question of fact precluding summary judgment in favor of Plaintiffs on this point.[10]

### 3. Merits of Plaintiffs' Argument Concerning 2011 & 2012 Returns

In their reply brief in support of the instant motion, Plaintiffs contend that Defendants' failure to timely file the 2011 tax return was an independent Event of Default under Sections 7.3(b) and 8.5, justifying their refusal to disburse the final loan funds. (Reply ISO Mot. to Alter at 4–5.) This argument is quickly dispatched.[11]

As Plaintiffs point out, we held in the Opinion that Defendants violated Section 7.3(b) by failing to timely file tax returns for 2011 and 2012. (Op. at 35–36.) Plaintiffs now specifically argue that Defendants' failure to file the 2011 return by March 15, 2012[12] gave rise to an Event of Default prior to Rowen's request for the final funds on April 5, 2012. This argument, however, ignores the factual dispute concerning when Rowen requested the final $65,000 on behalf of Playroom. As noted earlier herein, as well as in the Opinion, Rowen testified that he sought the final payment beginning in February or March 2012. (Op. at 39 (finding "questions

---

[10] Even if we found Section 8.5 to be ambiguous, Plaintiffs' motion would be denied because further evidence would be needed to explore the parties' intent. *See Gassner*, 409 Ill. App. at 1008, 948 N.E. 2d at 328. In any event, we cannot conclude, as Plaintiffs' contend, that Section 8.5 unambiguously prohibits all false statements, without regard to their materiality.

[11] We choose to address this argument, and the next, even though it is inappropriate for parties to raise additional arguments in a reply brief. *Wigod v. Wells Fargo Bank, N.A.*, 673 F.3d 547, 571 (7th Cir. 2012); *Padula v. Leimbach*, 656 F.3d 595, 605 (7th Cir. 2011).

[12] Plaintiffs assert that Playroom's returns are due annually on March 15 (rather than April 15) because it is an S Corp, which we accept for present purposes. (Reply ISO Mot. to Alter at 4.)

of material fact as to the timing of Playroom's requests and the Mahers' performance thereafter").)  We cannot conclude on the record before us that Defendants sought the funds only *after* March 15, 2012, as Plaintiffs assert.

### C. Default under Section 8.7(g)—Failure to Give Notice of Triways Lawsuit

In their reply brief in support of the instant motion, Plaintiffs contend that a factual finding we made in the Opinion establishes a default under Section 8.7(g).  (Reply ISO Mot. to Alter at 6–7.)  This argument mischaracterizes both the Opinion and Section 8.7(g).

We begin with a brief summary of the necessary facts.  Triways, a shipping company, filed a lawsuit against Playroom in March 2011, prior to execution of the Agreement.  (Op. at 25.)  The parties dispute whether Rowen informed Plaintiffs about that lawsuit.  (*Id.*)  Although the litigation was not identified on Schedule I, as required by Section 7.3(a), Defendants listed therein a past-due debt of $29,327.42 owed to Triways.  (*Id.*)

Playroom and Triways settled the litigation on November 2, 2011.  (*Id.* at 26.)  Their settlement agreement ("Triways Agreement") obligated Playroom to make monthly payments, but at some point Playroom fell behind in those payments to Triways.  (*Id.*)  As discussed in the Opinion, (*id.* at 32–33, 37), Plaintiffs established that Defendants' failure to comply with the Triways Agreement violated Section 5.1 of the Agreement, which requires Defendants to pay all "debts, obligations and liabilities . . . on or prior to their respective due dates," (Agreement § 5.1).  This violation of Section 5.1 triggered a breach and automatic acceleration of the debt under Section 8.7(g).[13]  (Op. at 37–38.)  Under Section 8.7(g), an Event of Default occurs if

---

[13] The record does not indicate when Playroom became delinquent under the Triways Agreement.  Plaintiffs have not argued, and we cannot conclude, that a Possible Default or Event of Default arose from that delinquency prior to Defendants' request for the final disbursement.

Defendants are not "paying its/his debts as they become due, unless such debt is being disputed and Lender has received written notice of such dispute." (Agreement § 8.7(g).)

Plaintiffs now argue that Defendants' failure to notify them about the commencement of the Triways litigation resulted in default under Section 8.7(g) upon execution of the Agreement. (Reply ISO Mot. to Alter at 6–7.) We reject this argument for two reasons. First, contrary to Plaintiffs' suggestion, we did not conclude in the Opinion that Defendants had violated Section 7.3(a) (or any other provision) by failing to disclose the Triways litigation.[14] Nor could we, in light of fact questions about what Rowen told Plaintiffs about that litigation and about the debt plainly identified on Schedule I as owed to Triways.

Second, even if Defendants failed to disclose the litigation, such a misrepresentation would run afoul of Section 7.3(a)—not Section 5.1—and would not trigger default under Section 8.7(g). Section 8.7(g) applies only upon Defendants' failure to pay debts as they become due. It does not apply to false or misleading representations under Section 7, which, as discussed earlier, are covered by Section 8.5. (*Compare* Agreement § 8.5 *with* § 8.7(g).)

In short, Plaintiffs are not entitled to prevail on their breach of contract claim because they cannot prove, on the record before us, that they were excused from further performance under the Agreement at the time that Defendants requested the final disbursement. Plaintiffs' motion does not present the type of "exceptional circumstances" that warrant reconsideration and is therefore denied. *See Bank of Waunakee*, 906 F.2d at 1191.

---

[14] In making this argument, Plaintiffs cherry-pick portions of the Opinion. (*See* Reply ISO Mot. to Alter at 6–7 (citing pages 25 and 37 of the Opinion).) Relatedly, our conclusion on page 37 of the Opinion—that the Mahers had not received "written notice of the dispute or resolution with Triways"—clearly refers in context to the lack of notice under Section 8.7(g) about the *dispute over missed payments* under the Triways Agreement. We are not referring at that point to any lack of notice about the *commencement* of the litigation, as asserted here.

**II.     Reconsideration, and Request for Entry of Final Judgment, as to Count Two**

The remaining two motions address our holding in the Opinion in favor of Plaintiffs as to

Count Two, breach of guaranty.  We first address Defendants' motion for reconsideration of that

ruling.  We then turn to consider Plaintiffs' request for entry of final judgment under Rule 54(b).

**A.     Motion for Reconsideration of Summary Judgment on Count Two**

In their motion, Defendants argue that Rowen cannot be held liable for breaching the

Guaranty at this point because Defendants' liability for alleged underlying breach of the

Agreement remains in question.  (Defs.' Mot. ¶¶ 3, 5–9.)  According to Defendants, they may be

excused from their obligations under the Agreement if the Mahers also breached it, as alleged in

the pending counterclaim.  And if Defendants may be excused from their obligations under the

Agreement, Rowen cannot be liable for failing to satisfy those same obligations as guarantor.

(*Id.*)  As such, Defendants argue, Count Two should not have been resolved on summary

judgment but should rise or fall with the breach of contract claims.  We disagree.

As a threshold matter, we deny the motion because it raises an argument that we have

already considered.  (Op. at 41–42 & n.29.)  Defendants previously contended that the open

factual question of Plaintiffs' performance under the Agreement applied equally to, and

precluded summary judgment on, the breach of guaranty claim.  (Defs.' MPSJ Resp. at 13.)

We fully appreciated Defendants' argument at the summary judgment stage, and Defendants

need not re-raise it now.

Additionally, Defendants are not entitled to reconsideration because we committed no

error.  To prevail on the breach of guaranty claim, the Mahers must demonstrate the original

indebtedness, the default of the debtor, and the existence of the Guaranty.  *Gen. Elec. Bus. Fin.*

*Servs., Inc. v. Silverman*, 693 F. Supp. 2d 796, 799 (N.D. Ill. 2010); *Mid-City Indus. Supply Co.*

*v. Horwitz*, 132 Ill. App. 3d 476, 483, 476 N.E.2d 1271, 1277 (1st Dist. 1985); *see also Lincoln Nat'l Life Ins. Co. v. TCF Nat'l Bank*, 10 C 6142, 2013 WL 3388865, at *3 (N.D. Ill. July 8, 2013); *FirstMerit Bank, NA v. Grasso*, 11 C 8986, 2012 WL 5200111, at *3 (N.D. Ill. Oct. 22, 2012). As noted in the Opinion, the original indebtedness under the Agreement and the validity of the Guaranty are not in question.

Defendants take issue with our conclusion as to the second element. Defendants argue that Rowen cannot be liable under the Guaranty because it is unclear whether Defendants' financial obligations are yet due and payable, resulting in any default under the Agreement. (Defs.' Mot. ¶¶ 6–9 (pointing to such language in Section 1(a).) That argument is unavailing, however, because our conclusion does not rest on—and is not swayed by—the language cited by Defendants.

The relevant language of the Guaranty is very clear.[15] Section 6 provides that:

> If any installment of principal and/or interest on the Note and/or any other Obligation is not fully paid when due . . . and/or upon the occurrence of any other Event of Default in the Loan Agreement and/or the Loan Documents, the entire unpaid balance of and all accrued and unpaid interest on the Note and the other Indebtedness shall, at [the Mahers'] sole option, be deemed to be accelerated and immediately due and payable in full for purposes of this Guaranty and the liability of [Rowen] hereunder.

(Guaranty § 6.) As mentioned in the Opinion, (Op. at 42), our analysis relies on the clause in Section 6 that permits the Mahers, at their discretion, to accelerate the debt and demand immediate payment "upon the occurrence of any other Event of Default in the Loan Agreement,"

---

[15] Contrary to Defendants' assertion, (Defs.' Mot. ¶¶ 4, 8), they are not entitled to strict construction of the Guaranty in favor of Rowen absent any ambiguity. Guaranties are interpreted strictly "in favor of the guarantor, but only where some doubt has arisen as to the meaning of the guaranty language." *JP Morgan Chase Bank, N.A. v. E.-W. Logistics, L.L.C.*, 380 Ill. Dec. 854, 865, 9 N.E.3d 104, 115 (1st Dist. 2014); *JLM Fin. Investments 4, LLC v. Aktipis*, 11 C 2561, 2013 WL 2434607, at *8 (N.D. Ill. June 3, 2013) (noting that courts generally apply principles of contract interpretation when construing guaranties).

(Guaranty § 6).  In other words, acceleration under the Guaranty is not authorized here by the lack of prompt payment under the Agreement but by the occurrence of other Events of Default. Section 6 permits the Mahers to accelerate the debt upon such defaults, independent of payment problems and without consideration to whether acceleration would be appropriate under the Agreement.[16]

We have concluded that Defendants violated Sections 5.1(b), 5.2(a), and 7.3 of the Agreement, triggering Events of Default under Sections 8.3 and 8.7(g).  (*See* Op. at 32–33, 36– 38, 42.)  The Mahers notified Rowen of the defaults by two letters dated August 20, 2012— one addressed to Playroom and Rowen and the other addressed solely to Rowen in his capacity as guarantor.  (*Id.* at 38, 42; *see* Compl., Ex. G (8/20/12 Ltr. from counsel to Rowen personally).) In the letter to Rowen as guarantor, the Mahers informed Rowen that Playroom's defaults under the Agreement constituted his defaults under the Guaranty.  (Compl., Ex. G.)  The Mahers expressly accelerated the debt and demanded payment.  (*Id.*)  It is undisputed that Rowen has not paid the outstanding debt.  Because Rowen has not paid the accelerated debt as required under the Guaranty, summary judgment was appropriate in favor of the Mahers and reconsideration is not warranted.

### B.      Request for Final Judgment on Count Two

In light of our ruling on Count Two, Plaintiffs ask that we enter final judgment against Rowen pursuant to Rule 54(b).  (Mot. Final J. ¶¶ 5 4–7.)  In a case involving more than one claim or multiple parties, we "may direct entry of a final judgment as to one or more, but fewer

---

[16] Section 6 is fully consistent with Section 1 of the Guaranty, in which Rowen guaranteed not only punctual payments but also "the performance by [Playroom] of all covenants, agreements, and obligations, whether payment or performance, of [Playroom] under the Note and all other Loan Documents."  (Guaranty § 1(c).)  The performance of covenants under the Agreement is therefore part of the "Obligations" guaranteed by Rowen in the Guaranty.

than all, claims or parties," but only if we "expressly determine[] that there is no just reason for delay." Fed. R. Civ. P. 54(b). "A proper Rule 54(b) order requires the district court to make two determinations: (1) that the order in question was truly a 'final judgment,' and (2) that there is no just reason to delay the appeal of the claim that was 'finally' decided." *Gen'l Ins. Co. of Am. v. Clark Mall Corp.*, 644 F.3d 375, 379 (7th Cir. 2011); *see also Curtiss-Wright Corp. v. Gen'l Elec. Co.*, 446 U.S. 1, 7–8, 100 S. Ct. 1460, 1464–65 (1980); *Wm. Wrigley Jr. Co. v. Cadbury Adams USA LLC*, 04 C 346, 2010 WL 4115427, at *3 (N.D. Ill. Oct. 18, 2010). A judgment is considered "final" if "it is an ultimate decision of an individual claim entered in the course of a multiple claims action." *Ind. Harbor Belt R. Co. v. Am. Cyanamid Co.*, 860 F.2d 1441, 1444 (7th Cir. 1988). In deciding whether there is "no just reason for delay," we "must take into account judicial administrative interests as well as the equities involved." *Curtiss-Wright Corp*, 446 U.S. at 8, 100 S. Ct. at 1465.

Both of these inquiries require us to assess "the factual relation between the issues that have been resolved and those that remain." *Marseilles Hydro Power, LLC v. Marseilles Land & Water Co.*, 518 F.3d 459, 463–64 (7th Cir. 2008); *Gen'l Ins. Co. of Am.*, 644 F.3d at 379; *Ind. Harbor Belt R. Co.*, 860 F.2d at 1444–45; *Autozone, Inc. v. Strick*, 03 C 8152, 2007 WL 683992, at *2 (N.D. Ill. Mar. 1, 2007). As the Seventh Circuit has explained, "if there is a great deal of factual overlap between the decided and the retained claims they are not separate, and appeal must be deferred till the latter are resolved." *Jack Walters & Sons Corp. v. Morton Bldg., Inc.*, 737 F.2d 698, 702 (7th Cir. 1984); *Ind. Harbor Belt R. Co.*, 860 F.2d at 1444; *Autozone, Inc.*, 2007 WL 683992, at *2. In undertaking this analysis, we bear in mind that the purpose underlying Rule 54(b) is "to spare the court of appeals from having to keep relearning the facts of a case on successive appeals." *Marseilles Hydro Power, LLC*, 518 F.3d at 464 (quoting

*Ind. Harbor Belt R. Co.*, 860 F.2d at 1444); *see Gen'l Ins. Co. of Am.*, 644 F.3d at 379. "Because Rule 54(b) departs from the norm, and has the potential to multiply litigation costs for parties and the appellate court, the district court must carefully consider" whether entry of final judgment is appropriate. *United States v. Ettrick Wood Prods., Inc.*, 916 F.2d 1211, 1218 (7th Cir. 1990); *Am. Family Mut. Ins. Co. v. Coleman*, 09 C 523, 2009 WL 4015521, at *2 (S.D. Ill. Nov. 19, 2009) ("[D]istrict courts are not to utilize Rule 54(b) unless there is a good reason for doing so.").

Consistent with these principles, we find that Plaintiff has not established that our holding on Count Two is a "final judgment" or that there is no just reason to delay. As Plaintiffs point out, we noted in the Opinion that the breach of contract and breach of guaranty claims were separate causes of action, with differing elements. (Op. at 42 n.20; *see* Mot. Final J. ¶¶ 3–4.) Contrary to Plaintiffs' position, however, the summary judgment ruling on Count Two is not "separate" from the breach of contract claim and counterclaim for purposes of Rule 54(b). Indeed, there is significant factual overlap between these claims. If we entered judgment now on Count Two, presided over trial on the breach of contract claims, and the case ultimately produced two separate appeals, we run the risk that "the [appellate] court would have to go over the same ground" in both appeals. *Autozone, Inc.*, 2007 WL 683992, at *2 (quoting *Lawyers Title Ins. Corp. v. Dearborn Title Corp.*, 118 F.2d 1157, 1162 (7th Cir. 1997)); *Ind. Harbor Belt R. Co.*, 860 F.2d at 1444–46. Under the facts present here, we decline to find that the ruling on Count Two is truly separate and final from the remaining contract dispute.

Relatedly, Plaintiffs have not articulated a good reason for us to depart from the norm under Rule 54(b). *See Ettrick Wood Prods., Inc.*, 916 F.2d at 1218. Entry of final judgment is neither so simple, nor so routine, as Plaintiffs' motion implies. Plaintiffs ask us to find that there

is no just reason to delay, but they offer no rationale.  (Mot. Final J. at 1, 3.)  They have not

identified, for example, any hardship they face by waiting for the proceedings to run their course

in the usual manner.  *See Morrison v. YTB Int'l, Inc.*, 08 C 565, 2010 WL 2132071, at *1

(S.D. Ill. May 14, 2010) (stating that relief under Rule 54(b) should be granted only "when a

failure to do so might harshly affect a party"); *see also Edgenet, Inc. v. GS1 U.S., Inc.*, 09 C 65,

2011 WL 1305219, at *2 (E.D. Wis. Apr. 1, 2011) ("[C]ourts in this circuit have often

considered whether there is a danger of hardship or injustice through delay that can be alleviated

by immediate appeal.").  In the absence of any such hardship, and in light of the factual overlap

between the claims, we deny Plaintiffs' motion for entry of final judgment without prejudice.

## CONCLUSION

For the reasons discussed above, the parties' motions (Dkt. Nos. 300, 302, and 304), are

denied.  Trial will address the remaining breach of contract claim against Playroom (Count One)

and Defendants' breach of contract counterclaim against the Mahers (Counterclaim

Count Three).  Trial shall focus particularly on the disputed element of the Mahers' performance

as well as closely related issues, such as the timing of the request for the final disbursement and

the existence of Possible Defaults or Events of Default prior to the Mahers' refusal to disburse

the final payment.  In open court at the status hearing hereby set for September 24, 2015 at

10:30 a.m., the parties shall submit their joint pre-trial order, which shall comply with this

opinion and the prior Opinion.  It is so ordered.

_____
Marvin E. Aspen
United States District Judge

Dated: July 7, 2015
      Chicago, Illinois